**Eleanor OOSTDYK, Plaintiff,**

v.

**BRITISH AIRTOURS LIMITED and British Airways Board, Defendants.**

No. 75 Civ. 4057.

United States District Court,
S. D. New York.

Dec. 10, 1976.

Kreindler & Kreindler, New York City, for plaintiff; Stanley J. Levy, New York City, of counsel.

Condon & Forsyth, Thomas J. Whalen, New York City, for defendant British Airtours, Ltd.; Ronald E. Pace, Lawrence Mentz, New York City, of counsel.

WYATT, District Judge.

This is a motion by defendant British Airtours, Ltd. ("Airtours") to dismiss the amended complaint as against it for lack of jurisdiction over the person. Fed.R.Civ.P. 12(b)(2). Affidavits with exhibits were submitted by both sides. There does not appear to be any dispute about the relevant facts.

The second defendant, British Airways Board ("Airways"), which owns all the stock of Airtours, does not contest jurisdiction over its person.

The action was commenced on August 15, 1975. (It is erroneously stated in an affidavit for plaintiff that the action was commenced "on December 17, 1974".) An amended complaint was filed on December 29, 1975 with the consent of defendants. The amended complaint asserts three claims for damages resulting from injuries suffered by plaintiff while she was a passenger on a flight from Rome to London. The airplane was owned and operated by Airtours. Federal jurisdiction is based upon diversity of citizenship, it being averred that plaintiff is a citizen of New Jersey and that the two defendants are United Kingdom corporations. 28 U.S.C. § 1332(a)(2).

### 1.

Plaintiff, a resident of New Jersey, made arrangements for a trip to London and Rome with a group on charter flights. The details of her contacts and contracts are not given, but none of them was with Airtours or Airways. According to an affidavit for her, she was offered a "package" and made her arrangements with "local tour operators". Airtours and Airways had nothing to do with her arrangements.

Plaintiff and the others in the group flew from New York (Kennedy) to London on a charter flight of Trans International Airlines.

From London to Rome and return, the group, with plaintiff, flew on a charter flight of Airtours. The contract for this flight was made in writing in England between Airtours and an English tour operator, namely, Olympic Holidays, Ltd. Olympic evidently acted on behalf of the "local tour operators" in the United States who were putting together the "package" trip. Neither Airtours nor Airways had any contacts in New York or elsewhere with plaintiff.

It was on the flight in an Airtours plane from Rome to London on August 22, 1974, that plaintiff was injured. She avers that her injuries were caused by the negligence of Airtours in flying through air turbulence.

According to her averments, plaintiff was seriously injured and is now paralyzed in both legs and both arms.

She was treated in hospitals in London from August 22, 1974 to March 3, 1975, when she returned to this country.

On the face of her claim, plaintiff arouses a natural sympathy. If she cannot assert her claim against Airtours in this Court or a

New York court, she must sue either in California (where Airtours might be suable) or in England. Either of these jurisdictions is obviously an inconvenient forum for her. Under established principles, however, I am forced to conclude that Airtours is not subject to the jurisdiction of the New York courts or of this Court, and that the motion must be granted.

### 2.

In this diversity action, whether Airtours is subject to suit here is determined by the law of New York. *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 119 (2d Cir. 1967), cert. denied, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968).

### 3.

Service of process was made upon Airways at its New York offices without challenge.

Airtours has no offices in New York, so service was attempted by delivery of a copy of the summons and complaint to New York counsel for Airtours, to Airways "as agent" for Airtours, and to the Secretary of State of New York under Section 307 of the Business Corporation Law of New York.

Airtours argues that none of these attempts at service are effective because it is not subject to the jurisdiction of the courts of New York or of this Court in a diversity action. While both sides agree that jurisdiction over Airtours cannot be had under the provisions of CPLR § 302 (the New York "long arm" statute), the plaintiff argues that Airtours is doing business in New York and has thus subjected itself to suit here under traditional principles of New York jurisdictional law as preserved in CPLR § 301.

Airtours denies that it has ever done business in New York, and this frames the issue to be decided on this motion to dismiss for lack of personal jurisdiction. Plaintiff argues that there are three grounds for a finding that Airtours is doing business in New York and amenable to suit here. They are: (1) that Airtours acting on its own behalf conducts permanent and continuous business activity in New York; (2) that its parent Airways performs substantial activities in New York as agent for Airtours; and (3) that Airtours and Airways are so closely related as to be in fact one business entity and that the activities in New York of Airways should be imputed to Airtours.

### 4.

Airways is an internationally scheduled air carrier organized and existing under the laws of the United Kingdom and apparently is owned by the British Government. Airways was formed as a result of a merger in the early 1970's between British Overseas Airways Corporation (BOAC) and British European Airways (BEA). Airways has three operating divisions—Overseas Division (which operates in the area formerly serviced by BOAC); European Division (which operates in territory formerly serviced by BEA); and Regional Division (which functions in the area formerly serviced by a number of small British air carriers). Airways maintains offices in New York and concededly does a substantial amount of business here on its own account.

Airtours is a wholly owned subsidiary of Airways, and is also a corporation organized under the laws of the United Kingdom. Airtours has its principal office at Gatwick Airport in Surrey, England. Airtours was formerly known as BEA Airtours, Ltd., but its name was changed at the time of the BEA–BOAC merger. For purposes of the present discussion "Airtours" will refer both to BEA Airtours and to British Airtours.

Airtours is engaged solely in the business of chartering aircraft to third parties, usually tour operators who arrange "package holidays" for tour groups. Airtours does not itself organize tours or provide to tour operators or tour groups any services (such as hotel accommodations and the like) other than air transportation.

All of the outstanding stock of Airtours is owned by Airways; two shares, for reasons of British law, are held by nominees of Airways.

Airtours has a seven member Board of Directors. Airways has a fourteen member Board of Directors. One of the directors of Airtours also serves as a director of Airways. Another is an employee of Airways. There is no evidence that Airways controls or directs the policy and operations of Airtours; on the contrary, there is evidence that the Airtours Board performs this function independently of Airways.

Airways participates in the profits of Airtours through dividends declared by the Board of Airtours. For the year 1975, such dividend amounted to 15% of Airtours' profits for the year.

Though both companies employ the same firm of auditors, the books and records of Airtours and Airways are separate. Airtours files a separate income tax return and pays taxes on its income independent of Airways. The net worth of Airtours is included as an asset of Airways in Airways' financial statements.

Airtours maintains its offices at Gatwick Airport, while Airways' principal office is located at Heathrow. Airtours has its own fleet of nine airplanes which are different in interior design and color from Airways' planes. Printed matter for passengers aboard the Airtours planes, such as menus and warning placards, differs from that used by Airways. Airtours planes bear an insignia, or "logo", distinct from corresponding markings on Airways' planes.

Airtours employs and trains its own cabin crews, and establishes its own criteria for in-flight cabin service. Airtours does not "borrow" cabin crews from Airways.

On the other hand, the uniforms worn by Airtours' cabin crews are identical to those worn by Airways' personnel. The corporate logo on Airtours' letterhead is similar in color and design to the logo of Airways, and there is evidence that the graphics department of Airways designed the letterhead of Airtours.

Both Airways and Airtours are insured for liability under the same policy of insurance issued by Lloyd's of London.

From time to time, Airtours and Airways provide services and equipment to each other. Airways performs the major maintenance work on Airtours' airplanes, though Airtours' personnel carry out routine preflight and post-flight maintenance. In certain countries other than the United States, Airways acts as "handling agent" for Airtours, performing such tasks as baggage handling, check-in of passengers, etc. Airways also contracts with other unrelated airlines to perform this service.

Airways in the United Kingdom purchases fuel for Airtours, including fuel used on the occasional Airtours flights to and from the United States. Airways' New York office also makes payments on behalf of Airtours to a tariff agent in New York and to an employee of Airtours located in Los Angeles, California.

Airtours does not have its own sales division. Under an arrangement with Airways, Mr. Geoffrey F. Joselin, a salaried employee of Airways Travel Division (the sales department of Airways) handles sales solicitation for Airtours. Joselin works in Airways' offices in England.

He and several subordinates devote part of their time to sales and solicitation of charters for Airtours. Airways pays the salaries of Joselin and his associates, and Airtours pays Airways a negotiated annual fee for their services and expenses. Joselin considers himself an "agent" for Airtours, and testified that when performing in that capacity he is under the direction of and answerable to the Managing Director and General Manager of Airtours. (Joselin Deposition, p. 4)

Joselin, when performing services for Airtours, contacts or is contacted by tour operators (usually located in the United Kingdom) who are putting together tour packages, and it is apparently Joselin who negotiates and executes the contracts for charter flights originating in the United Kingdom.

Airtours and Airways from time to time make use of each other's airplanes. Usually this happens when one of the companies has a temporary equipment shortage. For ex-

ample, if Airtours for reasons of mechanical trouble does not have an airplane available to perform a charter, it will arrange with another airline to use, for a fee, the aircraft of that airline. Sometimes the other airline will be Airways. The decision to turn to Airways rather than an unrelated company is a commercial one, governed by such factors as the size of the plane needed and cost. Whenever an Airways airplane is used by Airtours (or vice versa) a fee based on a rate per flying hour is paid under the terms of an existing financial agreement between Airtours and Airways. This agreement is renegotiated from time to time.

Each corporation, Airtours and Airways, has an account with the other, and in every instance in which equipment or services are furnished by one to the other, the account of the receiving party is charged. No services or equipment exchanges are gratuitous. There has never been a cash settlement of the accounts, but it appears that a running balance is maintained. At present, Airways owes Airtours. The principal source of this obligation is the use of Airtours' airplanes, and part of the amount owing by Airways arises from a "directing" of "surplus funds" of Airtours to Airways. (Ankers Deposition, p. 33)

### 5.

It appears that scheduled air carriers have difficulties in competing in the low cost charter flight business. These difficulties seem to arise in part because the scheduled carriers are members of International Air Transport Association (IATA), a trade association which by resolutions imposes restrictions on its members as to charter flights. The non-scheduled carriers are not members of IATA.

International scheduled carriers have sometimes believed it advantageous to have a subsidiary corporation as a non-scheduled carrier and a non-member of IATA. Complications may then ensue when the non-scheduled carrier subsidiary seeks to secure permits in other countries, particularly if the scheduled carrier parent is owned by a government. Domestic scheduled carriers then urge on their governments that they will be at a competitive disadvantage if foreign non-scheduled carriers, subsidiaries of foreign government owned scheduled carriers, are given landing rights and other permits for charter flights. It appears, for example, that "a U.S. route carrier" would not be authorized "to acquire control of a supplemental carrier" (47 CAB at 847).

The situation arose in this country in 1966 when Condor, a charter carrier subsidiary of Lufthansa, the international scheduled air carrier largely owned by the German government, applied to the CAB for a permit to engage in charter flights to and from points in the United States. Lufthansa was a member of IATA; Condor was not a member of IATA. There was opposition from domestic scheduled and non-scheduled carriers. These argued that they would be under competitive disadvantages because of the Lufthansa-Condor "working arrangements"; that Condor could operate charters which would be "off-route and excessive" under CAB regulations for Lufthansa charter flights; and that Lufthansa, through Condor, could evade the restrictive IATA charter resolutions. The Examiner agreed with these arguments and recommended that a permit be granted Condor but on condition that within two years Lufthansa divest itself of "all ownership and control" of Condor. The matter was then taken to the Board.

The opinion and order of the Board were filed on September 8, 1967, and are reported in 47 CAB 845. The order became effective on its approval by President Johnson on September 8, 1967.

The Board agreed with the Examiner that Condor should have a permit but did not agree that divestiture was required. Instead it imposed conditions which "will provide reasonable assurance that Condor's operations will be conducted independently of those of Lufthansa, and that, at least in the United States, there shall be no holding out to the public of any identity or relationship between them." (47 CAB at 849)

Thus the Board adopted as a principle that non-IATA charter flight subsidiaries of an IATA foreign carrier may receive permits for United States charter operations but only if they operate *independently* of each other and do not hold themselves out as in any way related.

6.

In 1972, Airtours (then BEA Airtours) applied to the Civil Aeronautics Board for a permit to engage in foreign charter air transportation to and from points in the United States. The situation was substantially the same as that in Condor. Again there was opposition by Pan Am and by non-scheduled domestic carriers and also by TWA and others.

The Administrative Law Judge recommended that the permit issue but that there should be "imposition of the so-called 'Condor conditions' designed to obviate any advantage which might inure to the applicant by virtue of its association with a scheduled carrier".

The Board made its decision, with an opinion, on June 25, 1973. This does not yet appear in the printed reports. The Board agreed with the Administrative Law Judge. The Board, among other things, stated:

"Airtours is a separate corporate entity under the laws of the United Kingdom. Although it is a wholly-owned subsidiary of BEA, it maintains its own corporate organization and financial records, owns its own aircraft, and does not engage in any commingling of property or accounts with BEA or BOAC.

\* \* \* \* \* \*

"Moreover, it should be noted that the British Airways Board has now accepted the 'Condor' conditions in any permit to be issued to Airtours and, under these conditions, the applicant will be required to maintain wholly separate operations with regard to the activities conducted in the United States."

The order of the Board, with the "Condor" conditions, became effective upon its approval by President Nixon on July 26, 1973.

The permit to Airtours was for a period of two years. Effective December 21, 1973, the permit was "reissued" to Airtours to reflect the change of name of the company from BEA Airtours to British Airtours Ltd. Airtours' permit has since expired, but apparently Airtours has been allowed to continue to operate under the terms of its original permit pending decision on an application by it for renewal.

The "Condor" conditions under which Airtours was issued its permit by CAB require such an independent parent-subsidiary operation by Airways-Airtours as to defeat all the arguments for plaintiff. It would, of course, be possible for plaintiff successfully to oppose the present motion if she showed that there had been a violation of the CAB "Condor" conditions. There has been no such showing expressly attempted and the evidence in the affidavits and exhibits does not indicate any violation of the conditions.

Thus the policy contained in the "Condor" conditions and observance of those conditions by Airtours and Airways mean that there is no factual basis for jurisdiction over Airtours in New York.

7.

It remains to discuss specifically what is shown as to activities (if any) of Airtours in New York and in the United States.

There is a list (Ex. G) of all charter flights performed by Airtours pursuant to the CAB permit from January 1, 1974 through December, 1975. This shows that Airtours operated 102 flights in that time period involving airports in the United States. An analysis of those flights reveals that 54 flights initially departed from England pursuant to charters with English or German charterers. Three of the 54 were flights around the world which stopped in the United States, on two occasions in New York. Of the remaining 51 flights (of the 54 flights initially departing from England) about 45 appear to have been bound for Los Angeles, and one for New York. The rest went to other United States cities.

Of the 48 flights originating in the United States (out of the 102 flights involving airports in the United States), 47 departed from Los Angeles. Each was a joint charter by the Los Angeles County Museum of Art and the Council of British Societies in Southern California. Joselin represented Airtours on each of these Los Angeles charters. The remaining flight originated in New York bound for London. This flight was a subcharter between Airtours and Laker Airways, which also has an office at Gatwick Airport. Laker had no plane available to perform a charter because of equipment malfunction, and in the emergency subchartered an Airtours airplane through J. R. Wood, Airtours' Operations Manager at Gatwick (in England).

The vast majority of Airtours' business in the United States has been centered around Los Angeles, where its prime customers, the Council of British Societies and the Los Angeles County Museum of Art are located. Airtours maintains its only office in the United States in Los Angeles, where there is but one Airtours employee whose function is to maintain contact with Airtours' customers and handling agents. This Los Angeles representative does not enter into charters on behalf of Airtours.

Certain services necessary to the operation by Airtours of flights in the United States, such as fuel purchases and catering, are arranged from the United Kingdom. Other services are performed in the United States by third parties under contracts with Airtours. For example, the baggage for Airtours' flights in and out of Los Angeles is handled by Continental Airlines under contract with Airtours.

It should be noted that in no event are Airways planes ever used in the United States operations of Airtours as such use would violate one of the conditions laid down by the Civil Aeronautics Board.

### 8.

Airtours has never been authorized to do business in New York, and it does not maintain an office or telephone listing in this state. It owns no real or personal property in New York, and has never filed or been required to file an income tax return in New York. It does not advertise in New York. Airtours maintains no bank accounts here, and has no loans from New York banks. It has no employees in New York and has never had a sales representative here. Furthermore, Airtours has never entered into any charter contracts in New York and has never contracted with a New York customer to provide charter air transportation.

Airtours does have the services of a tariff filing agent in New York, who files with the CAB on Airtours' behalf certain complex documents (tariffs) required for a foreign air carrier to operate in the United States. This filing agent is an employee of Airways, but it appears that he is an independent tariff filing agent as well, filing tariffs for airlines other than Airtours and Airways.

On the few occasions in 1974 and 1975 when Airtours aircraft used Kennedy Airport in New York, Airtours personnel came to New York to make arrangements, including the purchase of $52,000 in supplies, for those flights. In this connection, the Airtours people did not use any facilities of Airways in New York. None of these visits or purchases had any connection with the flight on which plaintiff was injured.

### 9.

Personal jurisdiction over Airtours may be acquired only if it is found to be doing business in New York under the traditional principles of New York law. This requires that Airtours be found "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851, 853 (1967), quoting *Simonson v. International Bank,* 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 436, 200 N.E.2d 427 (1964).

■ A foreign corporation may be "present" in New York in a jurisdictional sense by virtue of the physical presence here and the activities here of its *own* em-

**814**

ployees, or by acts in New York on its behalf by an agent or by an affiliate. Plaintiff argues that Airtours does business in New York both by its own acts and by those of its parent, Airways.

It seems clear, however, that there is no basis whatever for saying that Airtours, by its own activities and without regard to its connections with Airways, does business here. None of the usual indicia relied upon by New York courts to find *actual* corporate presence is found here. Airtours does not maintain an office, telephone listing, mailing address, employees, or bank account in New York, nor does it solicit business in New York or enter into contracts with New York customers. See, *Bryant v. Finnish National Airlines*, 15 N.Y.2d 426, 260 N.Y. S.2d 625, 208 N.E.2d 439 (1965).

On only four or five occasions have Airtours' airplanes landed on or taken off from New York airports. Three appear to have been mere stopovers in the course of round-the-world flights, and apparently no passengers were taken on or discharged in New York. One flight (originating in New York) was performed by Airtours under a subcharter, and was not business sought in New York by Airtours.

The isolated visits to New York by Airtours personnel in connection with these occasional flights are the only times (other than times related to this lawsuit) Airtours has ever had employees present in New York.

Such infrequent contacts with New York fall far short of the transaction by Airtours "with a fair measure of continuity and regularity of a reasonable amount of its business within this State" (*Bryant v. Finnish National Airlines*, above cited, 260 N.Y. S.2d at 627, 208 N.E.2d at 440), and do not suffice to give this Court jurisdiction over the person of Airtours.

Airtours could, however, be present in New York by virtue of the activities of its parent Airways, which concededly does a substantial amount of business in New York. While the mere existence of a parent-subsidiary relationship is not sufficient to subject the foreign subsidiary to in personam jurisdiction, if Airways acts as agent for Airtours in New York, "perform[ing] all the business" which Airtours could do "if it were here by its own officials", Airtours could be doing business here and amenable to the jurisdiction of courts in New York. *Frummer v. Hilton Hotels International, Inc.*, cited above. Or if Airtours is "in fact, if not in name" a mere branch of Airways and despite its separate incorporation, Airways' presence in New York might subject Airtours to personal jurisdiction. *Freeman v. Gordon & Breach, Science Publishers, Inc.*, 398 F.Supp. 519, 521 (S.D.N.Y.1975), citing *Public Administrator of County of New York v. Royal Bank of Canada*, 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967).

The record does not support a finding that Airways acts as Airtours' agent in New York. Whatever their arrangements may be with respect to operations outside the United States, the conditions imposed by the CAB on Airtours' permit to operate in this country specifically prohibit Airways from acting as Airtours' agent in New York or in any other state of this country. Theoretically Airtours could violate these conditions but the practical consequences foreclose any choice of such conduct.

In compliance with the CAB order, Airways does not advertise, promote or solicit business on Airtours' behalf in the United States; it does not lease aircraft to Airtours for use in the United States; and it does not collect money for or issue tickets on behalf of Airtours. Airtours does not use Airways' offices, business listing or personnel in New York.

The only service rendered by Airways in Airtours' behalf in New York is making payments to the tariff filing agent and to Airtours' Los Angeles representative.

It is clear that Airways does not do all the business in New York which Airtours could do were it here by its own officials. *Frummer v. Hilton Hotels International*, cited above. Accordingly Airtours is not amenable to suit in New York by virtue of any agency relationship with Airways.

Though Airtours does no business in New York by its own activities or through an agent, it might nevertheless be subject to jurisdiction here because of Airways' activities, if it is nothing more than a division of Airways and a separate corporation in name only. *Freeman v. Gordon & Breach Science Publishers, Inc.,* cited above; *Taca International Airlines, S. A. v. Rolls Royce of England, Ltd.,* 15 N.Y.2d 97, 256 N.Y. S.2d 129, 204 N.E.2d 329 (1965).

This situation is usually claimed to exist when a suit is brought against a foreign parent and jurisdiction is sought to be shown by the activities of a New York subsidiary. See, for example, *Taca International Airlines S. A. v. Rolls Royce of England, Ltd.,* cited above. There is at least one case in which the activities of the parent corporation in New York was held to provide a basis for jurisdiction over a "subsidiary" not otherwise present here. *Freeman v. Gordon & Breach Science Publishers Inc.,* cited above. The many factual differences make it unnecessary to decide whether this holding should be followed.

There is, of course, a closer relationship between Airtours and Airways than would be usual between two entirely unrelated entities. But the connection between the two even in England is no greater than that which would ordinarily exist between any parent corporation and its subsidiary. Without more, it must be concluded that Airtours is a corporation separate from Airways in fact as well as in name. The activities of Airways in the United States, governed as they are by the "Condor" conditions, cannot be attributed to Airtours to bring the latter within the jurisdiction of this Court.

The motion of Airtours is granted. Settle order, which may contain the direction for final judgment and the express determination provided for in Fed.R.Civ.P. 54(b).