Maxine Elizabeth JAYNE, Plaintiff,

v.

The ROYAL JORDANIAN AIRLINES CORP., a/k/a Alia et al., Defendants.

Peggy Ann BUCHMAN et al., Plaintiffs,

v.

ARAB WINGS et al., Defendants.

Peggy Ann BUCHMAN et al., Plaintiffs,

v.

ALIA, THE ROYAL JORDANIAN AIRLINES CORP. et al., Defendants.

Peggy Ann BUCHMAN et al., Plaintiffs,

v.

ARAB WINGS et al., Defendants.

Maxine Elizabeth JAYNE, Plaintiff,

v.

The ROYAL JORDANIAN AIRLINES CORP., a/k/a Alia et al., Defendants.

ROYAL JORDANIAN AIRLINES, INC. et al., Plaintiffs,

v.

GATES LEARJET CORPORATION et al., Defendants.

Nos. 78 Civ. 585 (VLB), 78 Civ. 3493 (VLB), 78 Civ. 4962–78 Civ. 4964 and 80 Civ. 1062.

United States District Court, S. D. New York.

July 15, 1980.

Condon & Forsyth, New York City, for defendants ALIA, The Royal Jordanian Airline, and Arab Wings Co. Limited.

Kreindler & Kreindler, New York City, for plaintiffs.

Lord, Bissell & Brook, Chicago, Ill., for defendant Gates Learjet Corp.

Davis, Polk & Wardwell, New York City, for defendant Gates Learjet.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

These cases, or portions of them,[1] are before me for consolidated or coordinated pretrial proceedings by orders of the Judicial Panel on Multidistrict Litigation filed on October 16, 1978 and February 4, 1980. *See* 28 U.S.C. § 1407. In all actions except Nos. 78 Civ. 4964 and 78–M–0026, defendant Arab Wings Company Limited ("Arab Wings") has moved for orders dismissing the complaints for lack of personal jurisdiction.[2] *See* Rule 12(b)(2), Fed.R.Civ.P.

For the reasons set forth below, Arab Wings' motions are denied.

### II.

The cases here numbered 78 Civ. 4962 and 78 Civ. 4963 were originally commenced in the Circuit Court of Cook County, Illinois. They were removed to the District Court for the Northern District of Illinois, Eastern Division, and thereafter consolidated for all purposes prior to transfer here. The case here numbered 78 Civ. 4964 was commenced in the Northern District of Illinois. The cases here numbered 78 Civ. 585 and 78 Civ. 3493 were both commenced in this district.

These five cases, in which defendant Arab Wings has moved for dismissal of the complaints for lack of personal jurisdiction, arise from the crash of an Arab Wings aircraft in Amman, Jordan on September 23, 1977. Plaintiffs Buchman and Jayne, citizens of Illinois and New York, respectively, sue for wrongful death and survival damages. Plaintiff Jayne sues as the administratrix (78 Civ. 585) and executrix (78 Civ. 4964) of the estate of her husband, an American citizen who died as a result of the crash. Plaintiff Buchman sues in her own and in her children's behalf and as administratrix of the estate of her husband, also an American citizen who died as a result of the crash. Defendant Arab Wings is a corporation organized under and existing by virtue of the laws of the Hashemite Kingdom of Jordan, with its principal place of business in Amman. Defendant Gates Learjet Corporation ("Gates"), which manufactured the Arab Wings aircraft, is a Delaware corporation with its principal place of business in Kansas.

---

1. By order of the Judicial Panel on Multidistrict Litigation filed February 4, 1980, the case numbered 80 Civ. 1062 (78–M–0026) above and then pending in the District Court for the District of Colorado ("the Colorado action") was transferred from the District of Colorado for inclusion in the coordinated or consolidated pretrial proceedings pending here in the other cases captioned above. Simultaneously, plaintiffs' claims in the Colorado action were separated and remanded to the District of Colorado, leaving here only the counterclaim of defendants in that action. The defendants' counterclaim seeks indemnification from plaintiffs for any judgment defendants may be required to satisfy in the other actions proceeding here.

2. The pre-transfer docket sheet for case No. 78 Civ. 4964 (78 C 3248) does not indicate that Arab Wings has moved in that action to dismiss the complaint under Rule 12(b)(2), Fed.R. Civ.P. Because of the interrelatedness of these cases, however, any order entered in the other cases in respect of the granting or denial of Arab Wings' motions to dismiss complaints will necessarily have the same jurisdictional consequence in case No. 78 Civ. 4964.

80 Civ. 1062 (78–M–0026) is an action originally brought by ALIA and Arab Wings in Colorado, and the portion of that case before me is defendants' counterclaim in that action. Thus there has been, with respect to that action, a voluntary submission by Arab Wings to the jurisdiction of the Colorado court.

These are diversity actions, and the amenability of a defendant to suit in a diversity action is normally governed by the law of the state in which the federal district court sits. *See Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 119 (2d Cir. 1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968). In determining the amenability of the defendant to suit in a multidistrict litigation, however, a transferee court must apply the law of the transferor forum, *see In re Plumbing Fixtures Litigation,* 342 F.Supp. 756, 758 (Jud.Pan. Mult.Lit.1972) (citing *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). Thus in determining whether there is personal jurisdiction over defendant Arab Wings, I must apply the law of New York to the cases commenced in New York and the law of Illinois to the cases commenced there.

### III.

Service of process on Arab Wings in these actions was effected by service of the summons and complaint in New York and Illinois on corporate officers of ALIA, The Royal Jordanian Airlines Corporation ("ALIA"), also a defendant in these actions. ALIA, which is Jordan's government-owned airline, has appeared in these actions and concedes that it is subject to *in personam* jurisdiction in New York and Illinois.

### IV.

I find the following facts for the limited purposes of these motions to dismiss. The findings are based on the affidavits, exhibits, and deposition testimony submitted: no hearing was held.

Arab Wings was organized in 1975 as an air charter company engaged in the transportation of passengers and cargo between points outside the United States. Arab Wings holds no foreign air carrier permit from the United States Civil Aeronautics Board and has never had scheduled or unscheduled service to any United States point. Arab Wings is not licensed or otherwise authorized to do business in New York or Illinois, does not maintain offices in either state, does not own, directly or indirectly, any type of property in either state, and has never paid taxes in either state. Arab Wings does not maintain a telephone listing, business listing, mailing address, or bank account in either state. No lawsuits, other than the instant actions, are pending against Arab Wings in either state, and it has never filed a suit in either state. Arab Wings has never leased, occupied, or sold space in any facility located in either state. Meetings of its board of directors take place in Amman, and all officers, directors, and employees live outside New York or Illinois.

In March 1975, ALIA was considering the formation of a jet charter service called "Arab Wings (Air Charters)" in the Middle East with the financial cooperation of certain Arab gulf states and the financial and technical cooperation of an American company engaged in a similar service.[3] A March 1975 memorandum suggested that ALIA and the American company each own

---

**3.** ALIA's Vice President for Finance has stated that it was not ALIA that initially promoted the formation of Arab Wings, but rather Jordan World Airways, an ALIA subsidiary (of which Mr. Ali Ghandour, the chairman and president of ALIA and Arab Wings, is president), and that it was for financial reasons that Jordan World Airways, "a year or so" after Arab Wings' formation, transferred its shares (80% at the time) to ALIA. However, a March 1975 memorandum entitled "EXECUTIVE JET AVIATION" and headed "*ALIA/THE ROYAL JORDANIAN AIRLINE,*" suggests that ALIA was a party to the first efforts to establish Arab Wings. The contents of this memorandum are generally described in the text following this footnote.

On the cover page of this memorandum, which is attached as Exhibit 2 to plaintiffs' memorandum in opposition to Arab Wings' motions to dismiss, are found these words "ALI GHANDOUR/CHAIRMAN OF THE BOARD/PRESIDENT." There is no indication, however, whether Mr. Ghandour was the memorandum's author or its recipient. The affidavit of Marc S. Moller, submitted in opposition to Arab Wings' motions to dismiss, mistakenly gives "*May,* 1975" as the date of the Exhibit 2 document, but explains that the document is a report from Khalid Bitar, ALIA's special projects manager and Mr. Ghandour's executive assistant, to Mr. Ghandour.

20%, the remaining 60% to be accounted for by other Jordanian entities and Arab gulf states. The American company would provide a marketing expert for three to six months to train a member of ALIA's marketing staff to be the service's marketing manager. ALIA's offices would be the general sales agents for all marketing and sales activities, the dispatch centers of ALIA and Arab Wings would be adjacent to each other, Arab Wings would be entitled to use ALIA's communications system, and an ALIA person was to be responsible for administration and accounts. Maintenance would be done by ALIA, and the American company would satisfy itself that ALIA could perform the maintenance.

On June 25, 1975, Mr. Ali Ghandour, who is president and chairman of the board of both ALIA and Arab Wings, distributed a memorandum on Arab Wings' letterhead to all ALIA vice presidents, directors, and managers in which Arab Wings was introduced to them as "our business jet charter service" and as a wholly owned subsidiary of ALIA. About three months later, an advertisement in the *Wall Street Journal* stated that the service of Arab Wings was "backed by the full resources of ALIA. . . . Our aircraft are flown, maintained and dispatched under the direction of true professionals who are required to meet the same high standards of performance set for all ALIA people." The advertisement named ALIA's United States and Canadian manager as an avenue for reserving an Arab Wings aircraft. This information was generally repeated in a 1976 Arab Wings promotional brochure, prepared by a New York public relations firm. The brochure also indicated that ALIA agents could secure hotel accommodations and "ease airport red tape" for the customers of Arab Wings, and

that an Arab Wings aircraft could be reserved "by contacting your local ALIA office or by telexing Flight Control Center in Amman, Jordan. An integral but distinct part of the ALIA headquarters, Arab Wings Flight Control Center can call upon the full resources of the airline and its agents." [4]

The ownership and maintenance arrangements of Arab Wings appear later to have changed. In Arab Wings' 1976 annual report, the American company is referred to as having had a short-term equity in Arab Wings,[5] "but subsequently Arab Wings became totally Arab owned and was absorbed into the parent ALIA operation." Since 1977 Arab Wings has been an 88% subsidiary of ALIA. The remaining 12% is owned by the Sultanate of Oman.

Regarding maintenance, the 1976 annual report states that "[a]ircraft receive full service at Arab Wings' maintenance facility in Amman. . . . Arab Wings maintenance is further supported by the technical expertise of ALIA." The current Vice President of Finance and Administration of Arab Wings states that Arab Wings operates its own maintenance and service center at Amman airport, maintains its own supply of parts and ground equipment, has its own hangars, and does not use any of ALIA's facilities at Amman or other airports. Any occasional services rendered to Arab Wings by ALIA are charged against an account maintained by Arab Wings with ALIA. No services are gratuitous.

The management of the two companies has a history of interrelatedness. The notes to the financial statements in Arab Wings' 1976 annual report contained a statement under Note 3, "Management of the Compa-

**4.** The same New York public relations firm prepared the Arab Wings *Wall Street Journal* advertisement and the 1976 Arab Wings promotional brochure. 25,000 copies of the promotional brochure were printed in New York. This firm began working for Arab Wings in 1974 (sometime before Arab Wings was launched), continues to do so, and had total gross billings for Arab Wings' account from 1976 through 1978 in excess of $85,000.

The Executive Assistant to ALIA's Chairman stated that the representation that Arab Wings was "backed by the complete resources of ALIA," was intended to refer to nothing more than the communications facilities that ALIA allowed Arab Wings to use.

**5.** The American company never received the necessary permission from the Jordanian government to become a shareholder of a Jordanian company.

ny," to the following effect: "According to an agreement between the Company and Alia The Royal Jordanian Airline, the latter assumes management of the Company in return for a fee equal to 30% of the company's annual salaries."

ALIA's Vice President for Finance and Arab Wings' Vice President for Finance and Administration deny that a management agreement, written or oral, exists between ALIA and Arab Wings. The ALIA officer explained that what auditors referred to as a "management agreement" was, in fact, an "internal ALIA letter," never subscribed to or implemented by Arab Wings.

In addition to Ali Ghandour, who is president and chairman of the board of both Arab Wings and ALIA, three other directors of Arab Wings, which has a five member board, are directors of ALIA.

Key management personnel have been transferred between the two companies under ALIA's "secondment" program. Under this program, ALIA receives a fee for all transfers, and ALIA employees receive no benefits from ALIA while in the employ of Arab Wings, though they can return to ALIA in at least their departing rank. Thus ALIA's executive assistant to the president became Arab Wings' vice president for marketing and sales for one year beginning August 1, 1977. ALIA's dispatcher became Arab Wings' chief dispatcher from 1975 to 1978. ALIA's traffic officer became Arab Wings' dispatcher from 1975 to 1978. ALIA's superintendent of the finance department became Arab Wings' accounts manager in 1977 and continues as such. ALIA's vice president for special projects became Arab Wings' senior vice president for marketing and sales in 1978 and continues as such.[6]

Arab Wings' day-to-day operations are performed independently by the staff and employees of Arab Wings, who are not employed by ALIA. Arab Wings and ALIA maintain separate books and records, and Arab Wings files a tax return in Jordan independent of ALIA. Arab Wings makes no financial or operational reports to ALIA and its profits do not inure to ALIA. Arab Wings and ALIA maintain separate offices in Amman and own their own fleets of aircraft, though the markings on the aircraft are similar in cólor and arrangement. Arab Wings employs and trains its own flight and cabin crews and does not "borrow" crews from ALIA. Uniforms worn by Arab Wings and ALIA crews are different, though in an Arab Wings promotional brochure, Arab Wings pilots are shown wearing ALIA ties.

In other ways, however, the two companies' operations are related. Aside from Arab Wings' flight control center, referred to above, which is an "integral but distinct" part of ALIA's Amman headquarters, the pay scales for ALIA and Arab Wings have been deliberately correlated. The invoices used in connection with plaintiffs' flight, and Arab Wings' stationery until relatively recently, bore the legend "General Sales Agent: ALIA/The Royal Jordanian Airline."[7]

Repayment under a loan agreement between Arab Wings and The Chase Manhattan Bank, dated May 20, 1975, was unconditionally guaranteed by Jordan's Minister of Finance, an arrangement suggesting the close ties between ALIA, a government-owned airline, and Arab Wings. At least one payment on this loan has been made to Chase's New York office by ALIA on behalf of Arab Wings. Another loan in April 1976, made to Arab Wings by the Union de Banques Arabes et Franaises, was guaranteed by ALIA and was secured by a mortgage on one of ALIA's aircraft. A loan to Arab Wings made by the Crocker National Bank

**6.** From 1975 through 1976, ALIA's budget manager also acted as Arab Wings' chief accountant, though this arrangement does not appear to have been effected under the "secondment" program.

**7.** Despite the representation contained in these documents, the president and chairman of both ALIA and Arab Wings denies that ALIA is the general sales agent of Arab Wings and states that there is no written agency agreement between them.

as agent for several banks in November 1976 was guaranteed by ALIA, and the loan agreement provided that legal action against Arab Wings with respect to the loan would be commenced by service of process in London on ALIA.

On the Arab Wings hull and liability insurance policy that pertains to the crash involved in these actions, the "name and address of insured" were designated as "'ALIA' The Royal Jordanian Airline Corp. &/or Arab Wings, Amman," although Arab Wings alone paid premiums on this policy.

Arab Wings has been the recipient of certain privileges that might not have been granted to a private corporation less closely related to ALIA. For instance, Arab Wings is exempt from landing and parking fees at all Jordanian airports and is exempt from Jordanian customs and import duties.

ALIA press releases in New York, prepared by a New York public relations firm for release on three dates in 1976 and 1977, referred to the Arab Wings executive air charter service in terms suggesting that it is a part of the ALIA operation. Thus a release for ALIA/The Royal Jordanian Airline and Syrian Air,[8] dated December 1, 1977, stated that ALIA had executive charter flights available in the Middle East:

> Alia, The Royal Jordanian Airline, was founded in 1963, and is the official airline of the Kingdom of Jordan. The airline flies to most major European and Middle East capitals, and also has all-cargo and executive charter flights available in the Middle East.

A December 13, 1977 press release gave somewhat more detail:

> In addition to the scheduled airline services, ALIA's subsidiary, Arab Wings, offers business travellers direct charter services from Amman to all areas of the Middle East, using a fleet of Learjets and Sabreliners. Another subsidiary, Jordanian World Airways, offers charter air cargo service, using B–720 equipment.

8. In 1977 the State Department and the CAB approved the first non-stop service between New York and Amman/Damascus, with the route being designated a joint service of ALIA

A release dated April 18[9] promoted "Arab Wings jet taxis," which "cover Middle East for busy executives." The release identified Arab Wings as a subsidiary of ALIA, and noted that the Arab wings "planes can be reserved through any Alia office of by telexing the Flight Control Center in Amman, 925 1608 ALIAJO."

ALIA has negotiated on behalf of Arab Wings with respect to a project to make photographic surveys of the Middle East from the air.

ALIA and Arab Wings have brought suit in the United States as co-plaintiffs to recover damages arising from the loss of an Arab Wings aircraft that was acquired under the same purchase agreement as was the aircraft involved in these actions. In that American action, *Royal Jordanian Airlines, Inc., et al. v. Gates Learjet Corp., et al.*, C.A. No. 78–M–0026 (D.Colo.), ALIA and Arab Wings as plaintiffs jointly alleged ownership, operation, and use of the aircraft as well as damages.

In June 1979 a motion was made in that action to substitute as plaintiffs the insurance companies which had fully paid the claims of the airlines (ALIA and Arab Wings). In an affidavit dated June 19, 1979 in support of that motion one of plaintiff's attorneys, setting forth information "known to me personally, in my capacity as attorney for plaintiffs," asserted that payment in full had been made by the insurance companies to the "Airlines" (defined in the affidavit as "Royal Jordanian Airlines and Arab Wings"):

> 4. Some time prior to September 9, 1977, the underwriters made payments totalling $164,042.30 to the Airlines under policies of insurance covering the aircraft that crashed on May 18, 1976. Over $133,000 of said amount was paid directly by the underwriters to defendant, GATES LEARJET.

and Syrian Arab Airlines. Service began on this route on July 11, 1977.

9. This release was presumably made on April 18, 1978.

5. A further payment in the amount of $16,650.60 was made prior to March 29, 1979, which amount comprises the total settlement of the claim of the Airlines arising out of the accident.

The proposed amended complaint, verified by the same attorney on June 20, 1979, asserts that the aircraft involved had been sold to the "Airlines" (defined as "Royal Jordanian Airlines, Inc. and Arab Wings"); that the insurance companies had "insured the Airlines for damage done to aircraft owned by them"; that the aircraft had crashed; and that the insurance companies had "paid to the Airlines or for their benefit, the sum of $180,692.90, in payment of the damage suffered by the Airlines . . . ."[10]

That ALIA personnel would actively participate in the chartering of Arab Wings aircraft was contemplated from Arab Wings' very beginning. The June 25, 1975 Arab Wings memorandum from Ali Ghandour to ALIA vice presidents, directors, and managers, *supra,* p. 852, contained rate information, described the Arab Wings fleet, listed the names of certain Arab Wings personnel so as "to facilitate communication between Alia Staff and Arab Wings," described how to reserve an Arab Wings aircraft, and attached a specimen Arab Wings contract form. The recipients of the memorandum were advised to execute the contract in three copies, "one for the charterer, one to be retained by the issuing office and one to be forwarded to the Chief Accountant of Arab Wings."

ALIA's participation in the chartering of Arab Wings aircraft continued beyond the founding year. In January 1978, a senior vice president of Arab Wings, who had earlier been the executive assistant to the president of ALIA, addressed a meeting in New York of ALIA district sales managers from throughout the United States on the subject of Arab Wings' services and reservation and confirmation procedures. A press release prepared on September 7, 1978 by a New York public relations firm states that to reserve an Arab Wings aircraft "contact any office of ALIA/The Royal Jordanian Airline." Also indicative of the close relationship between Arab Wings and ALIA for purposes of promotion and solicitation is an advertisement in a *Sheraton* magazine in which Arab Wings identified as its own each of ALIA's seven Middle East offices and phone and telex numbers.

On various occasions Arab Wings' clients have chartered aircraft from New York with the assistance of a New York-based ALIA employee. This employee, who receives a 5% commission for each charter he arranges,[11] telexes client inquiries concerning rates and aircraft availability directly to Arab Wings in Amman. Arab Wings' telexed response is directed to the ALIA employee in New York. The employee then passes this information along to the client, and if the client wishes to charter an Arab Wings aircraft the ALIA employee forwards to him a standard form Arab Wings charter agreement, which, on at least one occasion, bore the name and New York address of ALIA and appears to have been accompanied by the cover letter, on ALIA stationery, of ALIA's general manager for North America. Communications by ALIA to Arab Wings in Amman in behalf of New York clients are paid for by Arab Wings and charter payments are made directly to Arab Wings in Amman, not to ALIA. In 1978, ALIA's New York employee contacted twenty to thirty New York travel agents and the officers of four United States airlines in behalf of Arab Wings and generated commissions of approximately $800, which, calculating on the basis of his 5% commission, represent approximately $16,000 in revenues for Arab Wings.

---

10. Arab Wings now claims that the allegations of this pleading were incorrect, and resulted from "the necessity of getting the action on file." Arab Wings emphasizes that the insurers of the Colorado aircraft paid Arab Wings alone for property damage to the aircraft, and Arab Wings alone assigned its cause of action to the insurers.

11. Arab Wings asserts that it will pay a commission to any person or travel agent who introduces a chartering customer.

## V.

### The New York Actions

Plaintiffs and defendant Gates concede that jurisdiction over Arab Wings does not lie under New York's "long-arm" statute. *See* N.Y.Civ.Prac.Law § 302 (McKinney Cum.Supp. 1979–1980). It is not claimed that the causes of action of the New York plaintiffs arose from Arab Wings' transaction of business in New York.

The pertinent statute with respect to the New York actions is N.Y.Civ.Prac.Law § 301 (McKinney 1972):

> A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore.

■ Under New York's jurisdictional case law, jurisdiction exists over a foreign corporation if "it was 'doing business' [in New York] in the *traditional* sense." *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 536, 227 N.E.2d 851, 853, 281 N.Y.S.2d 41, 43 (1967) (emphasis in original). A corporation is amenable to suit in New York courts "if it is 'engaged in such a continuous and systematic course of "doing business" here as to warrant a finding of its "presence" in this jurisdiction.'" *Frummer, supra*, (quoting *Simonson v. International Bank*, 14 N.Y.2d 281, 285, 200 N.E.2d 427, 429, 251 N.Y.S.2d 433, 436 (1964)).

### A. Activity in the State

■ The "presence" of a corporation may be predicated upon its own activities within the state. Arab Wings' direct contacts with New York consist of its purchases of the services of a New York public relations firm, its single purchase of an advertisement in a newspaper with circulation in New York, and its borrowing of substantial sums of money from, and certain repayments to, New York banks. To predicate *in personam* jurisdiction over Arab Wings in New York on these facts would ascribe undue significance to essentially tenuous contacts. Arranging with professionals for the production of promotional literature, advertising in potential markets, and borrowing money are, of course, activities incidental to the operation of many businesses and may at times constitute substantial parts of a corporation's business activities. This is not so, however, in the case of Arab Wings. Its business is the chartering of jet aircraft for transportation in the Middle East. The activities constituting its direct New York contacts may enhance its business, and certainly have been intended to do so, but they are nonetheless incidental to it and "fall far short of the transaction by [Arab Wings] 'with a fair measure of continuity and regularity [of] a reasonable amount of its business within [New York] State.'" *Oostdyk v. British Airtours Ltd.*, 424 F.Supp. 807, 814 (S.D.N.Y.1976) (quoting *Bryant v. Finnish Nat'l Airlines*, 15 N.Y.2d 426, 430, 208 N.E.2d 439, 440, 260 N.Y.S.2d 625, 627 (1965)). *In personam* jurisdiction over Arab Wings is not, therefore, established on the basis of its own activities in the state.

### B. Agent's Activities in the State

■ The "presence" of a corporation may also be established, however, by activities conducted in its behalf in the state by an agent. In the absence of an express agency agreement, the common ownership of two corporations "gives rise to a valid inference as to the broad scope of the agency," *Frummer, supra*, 19 N.Y.2d at 538, 227 N.E.2d at 854, 281 N.Y.S.2d at 45. The relationship of parent and subsidiary, though not by itself jurisdiction-conferring, gives rise to an inference of a broad agency relationship between the two, even when, as here, it is the parent that is within the jurisdiction and not the subsidiary. *Freeman v. Gordon & Breach, Science Publishers, Inc.*, 398 F.Supp. 519, 521 (S.D.N.Y. 1975) (applying New York law). Though the inference of agency cannot extend the actual scope of the agency, *Delagi v. Volkswagenwerk AG*, 29 N.Y.2d 426, 431, 278 N.E.2d 895, 897, 328 N.Y.S.2d 653, 656 (1972), the activities of the in-state parent will confer jurisdiction under an agency theory if the corporation within the state "does all the business which [the other corporation] could do were it here by its own officials." *Frummer, supra*, 19 N.Y.2d at 537, 227 N.E.2d at 854, 281 N.Y.S.2d at 44.

In the *Frummer* case, the jurisdictional presence of Hilton Hotels (U.K.) Ltd., a British corporation, was established by way of the activities performed in its behalf in New York by the Hilton Reservation Service, an organization established and operated on a "non-profit" basis for the benefit of the London Hilton and other Hilton hotels. The service, which maintained a New York office, bank account, and telephone number, performed public relations and publicity work for Hilton hotels, including Hilton Hotels (U.K.) Ltd., provided rates on request to certified wholesalers and tour operators, and confirmed availabilities immediately without charge. The "significant and pivotal factor" cited by the New York Court of Appeals in justifying its conclusion that Hilton Hotels (U.K.) Ltd. was present in the state through the activities of the service was that the reservation service was able to accept and confirm reservations in New York for space at the London hotel, which indicated that the reservation service did "all the business which Hilton (U.K.) could do were it here by its own officials." *Frummer, supra,* at 547, 227 N.E.2d at 854, 281 N.Y.S.2d at 44. This distinguished the case from *Miller v. Surf Properties, Inc.,* 4 N.Y.2d 475, 151 N.E.2d 874, 176 N.Y.S.2d 318 (1958), which had held that an in-state agent's "mere solicitation" of business for an out-of-state concern was not enough to constitute "doing business." In *Frummer,* the common ownership of Hilton (U.K.) and the reservation service was significant "only because it [gave] rise to a valid inference as to the broad scope of the agency in the absence of an express agency agreement . . . ." *Id.* 19 N.Y.2d at 538, 227 N.E.2d at 854, 281 N.Y.S.2d at 45.

Following the *Frummer* decision, federal courts applying New York law in reservation service cases have seemed to focus on the question whether the in-state services company has the authority to make final reservations in the name of the out-of-state defendant. In *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116 (2d Cir. 1967), for example, the New York booking agent's ability to confirm reservations for the out-of-state defendant's tours and the agent's offering of a broad range of services akin to those offered by the reservation service in *Frummer* were cited as sufficient evidence of agency to satisfy *Frummer's* "doing business" test.[12]

In *Kopolowitz v. Deepdene Hotel & Tennis Club,* 464 F.Supp. 677 (S.D.N.Y.1979), it was the New York representative's lack of authority to confirm reservations in New York that was fatal to the plaintiff's attempt to acquire jurisdiction over a Bermuda hotel. The New York agent in that case booked approximately 90% of the hotel's yearly business, was paid a fee and received a commission for its services, displayed the hotel's literature, handled inquiries and requests for reservations, promoted the hotel with the public, travel agents, transportation lines, and information bureaus, and distributed 50,000 pieces of the hotel's brochures and tariff information. Pursuant to a "Sell and Report" policy, the agent confirmed space without requesting it from the hotel, but maintained weekly consultations with the hotel to avoid overbooking. Despite the extensive services performed in the hotel's behalf, the *Kopolowitz* court found it determinative that ultimate confirming authority remained with the hotel and that the agent confirmed at its own risk. *Id.* at 679–80.

Arab Wings emphasizes that its aircraft charters are confirmed solely by its own officials in Amman and characterizes ALIA's role in the chartering process as that of a conduit through which is passed the client's inquiry and Arab Wings' response, directly from Amman. Relying on *Miller v. Surf Props.,* 4 N.Y.2d 475, 151 N.E.2d 874, 176 N.Y.S.2d 318 (1958), Arab Wings argues that ALIA's chartering activities, being limited to "confirming availabilities" rather than "making final reserva-

---

**12.** Referring to *Gelfand,* but in another context, the New York Court of Appeals has emphasized the jurisdictional significance of being "authorized to make final reservations, rather than merely confirming availabilities . . . ." *Delagi v. Volkswagenwerk AG,* 29 N.Y.2d at 433, 278 N.E.2d at 898, 328 N.Y.S.2d at 657 (dictum).

tions," constitute the "mere solicitation" of business and therefore do not suffice to establish its presence in the jurisdiction.

■ The determination, under *Frummer*, of whether ALIA does all the business in New York that Arab Wings could do were it here by its own officials necessarily begins with the question of precisely what business Arab Wings could do were it here by its own officials. As mentioned above, the business of Arab Wings is the chartering of jet aircraft in the Middle East. Some of the activities that comprise this business, such as the operation of the aircraft, are by definition performable only in the Middle East. Other activities of the business can be performed anywhere but are performed in the Middle East by reason of the superior utility of performing them in close proximity to corporate headquarters and through the operation of a single facility. These include the dispatch of aircraft and the approval of charter reservations. Still other activities are performable anywhere and are best performed in numerous locations. These include the solicitation of charterers and the arrangement of charters.

It is this last variety of activity that Arab Wings could conduct in New York were it here by its own officials and that ALIA allegedly conducts here in Arab Wings' behalf. Given that the situs of Arab Wings' contracting authority is in Amman, it is difficult to imagine how Arab Wings, if it were itself in New York for the purpose of arranging aircraft charters, could do more than what is allegedly done by ALIA. It could at most, like ALIA, operate a conduit to the confirming authority in Amman.

Thus, although ALIA lacks the authority to confirm final reservations in New York, ALIA's New York agency activities in behalf of Arab Wings seem to satisfy *Frummer*'s requirement that the in-state agent do all the business that the out-of-state defendant could do were it here by its own officials. Nevertheless, if the definitive touchstone for a corporation's "doing business" presence is whether the representative present in New York has the power finally to confirm reservations, *see Miller, supra; Kopolowitz, supra; Gelfand, supra,* ALIA's chartering activities in New York would not, without more, suffice to confer jurisdiction over Arab Wings. To the extent of its chartering activities, ALIA's New York representation of Arab Wings is poised between the competing requirements of the *Frummer* and *Miller* holdings.

There is evidence, however, that ALIA's New York employees do much more in behalf of Arab Wings than provide a conduit for the passage of chartering information. ALIA's facilities are available to Arab Wings clients for the purpose of easing airport red tape and arranging for hotel accommodations. Arab Wings claims that ALIA was not intended to be the general sales agent for Arab Wings, but the unqualified representation printed on Arab Wings stationery is to the contrary. ALIA's name and address appear on documents relating to the charters. An Arab Wings official, who came to that company under ALIA's "secondment" program, addressed American-based ALIA personnel specifically about Arab Wings' services and its reservation and confirmation procedures. ALIA's New York employees are capable of doing much more for an Arab Wings' charterer than the average travel agent. These additional activities, viewed together with ALIA's solicitation of business on behalf of Arab Wings, its execution of charters as an issuing office on behalf of Arab Wings, its issuance of ALIA press releases promoting Arab Wings charters as an additional service of ALIA, its business negotiations on behalf of Arab Wings, and its repayment or guarantee of loans to Arab Wings, indicate that the actual scope of the agency to be inferred from the companies' common ownership is broad indeed. Under these circumstances, ALIA's lack of authority to confirm final reservations appears to be but a slight—and perhaps logistically necessary—constriction on an otherwise expansive agency. Thus, in addition to its "mere solicitation" of business in Arab Wings' behalf, ALIA conducts other activities for Arab Wings in New York that take these

cases outside the holding of *Miller v. Surf Properties, Inc., supra*, for it is well established that "solicitation . . . plus some additional activities [in the jurisdiction] are sufficient to render the corporation amenable to suit." *International Shoe Co. v. Washington*, 326 U.S. 310, 314, 66 S.Ct. 154, 157, 90 L.Ed. 95 (1945). *In personam* jurisdiction is therefore properly asserted by New York federal district courts in these diversity actions over defendant Arab Wings.

### C. Subsidiary as "Mere Department" of Parent

■ The close relationship between ALIA and Arab Wings also subjects Arab Wings to *in personam* jurisdiction in New York as ALIA's "mere department." *See Public Adm'r v. Royal Bank of Canada*, 19 N.Y.2d 127, 224 N.E.2d 877, 278 N.Y.S.2d 378 (1967); *Taca Int'l Airlines, S. A. v. Rolls-Royce of England*, 15 N.Y.2d 97, 204 N.E.2d 329, 256 N.Y.S.2d 129 (1965).

ALIA owns a substantial proportion of Arab Wings' shares. The two companies share four directors, including the chairman of their respective boards. Exchanges of high management personnel have occurred and appear to continue under ALIA's program of "secondment." The salary scales of the two companies appear purposely to have been correlated. ALIA has guaranteed loans made to Arab Wings. The two have jointly purchased aircraft liability insurance. Certain of Arab Wings' operational facilities are operated in "integral but distinct" fashion with those of ALIA. Their aircraft have similar markings, and Arab Wings' services are generally represented to be backed by ALIA's resources. At its inception, Arab Wings was described to ALIA management as "our business jet charter service."

Against these indications of unity, Arab Wings raises the formal corporate and operational separateness of the two entities. They maintain separate books and records. Arab Wings makes no operational or financial reports to ALIA and its profits do not inure to ALIA. The day-to-day operation of Arab Wings is not supervised by ALIA and is conducted independently of ALIA.

While these manifestations of separateness clearly place the facts before me in a distinct category from those in *Public Adm'r v. Royal Bank of Canada, supra*, in which the French subsidiary of the Royal Bank of Canada was found to be, in fact, the same entity merely doing business under a different name, I find that the easy interchange between the two companies in financial, promotional, and operational matters indicates that ALIA considers Arab Wings to be a part of its total airline services offering. To find otherwise would be to exalt form over substance and to ignore the aggregate effect of activities and relationships that, taken singly, would not satisfy the "mere department" rule.

In so finding, I do not overlook the dictum in *Delagi v. Volkswagenwerk AG, supra*, 29 N.Y.2d at 432, 278 N.E.2d at 897, 328 N.Y.S.2d at 657 (citation omitted), that "[e]ven if [the New York franchised distributor] were a subsidiary of [the German manufacturer and seller defendant], which it is not, the alleged control activities of [the manufacturer] would not be sufficient to make [the distributor] a mere department of [the manufacturer]." The control activities referred to in *Delagi* included requirements that distributors and their independent franchised dealers sell a minimum number of automobiles, uniformly design service departments, train their service personnel in Germany, adhere to uniform purchase and sales prices, and submit to prior approval of prospective dealers. These are rigid controls, indeed, and there is no evidence that ALIA's controls over Arab Wings, if any, approach them.

I find a distinction between these cases and *Delagi*, however, that justifies a different result here, despite the absence of rigid control. Unlike the automobile manufacturer and its distributors in *Delagi*, ALIA and Arab Wings sell only a service, not a physical product. Many of the indications that their services are interrelated and that Arab Wings is operated as a department of ALIA appear in publicity brochures, adver-

tisements, press releases, and even corporate reports, which are documents intended for the potential consumers of their services. These representations indicate that the parent and its subsidiary find a value in their joint promotion and in associating the services of the subsidiary with those of the parent in the mind of the public. There is in this promotion the projection of a unified public persona, despite formal separateness, by which a quality service on the part of the subsidiary is suggested by identification with the parent. Even though ALIA does not exercise over Arab Wings the day-to-day supervision of operations normally associated with a "mere department," Arab Wings has been represented as closely tied to ALIA for purposes of instilling confidence in the minds of potential charterers. I emphasize that it is not this factor by itself that establishes Arab Wings as ALIA's "mere department." Rather, it is the public association of the two companies, together with their other points of interrelatedness, that overcomes their corporate and operational separateness and tips the balance in favor of their constituting a single enterprise for jurisdictional purposes.

## IV.

*The Illinois Actions*

Section 13.3 of the Illinois Civil Practice Act (Ill.Rev.Stat., ch. 110, ¶ 13.3 (1975)) provides:

A private corporation may be served (1) by leaving a copy of the process with its registered agent or any officer or agent of said corporation found anywhere in the State; or (2) in any other manner now or hereafter permitted by law. A private corporation may also be notified by publication and mail in like manner and with like effect as individuals.

The Supreme Court of Illinois has stated that "[t]his section has been judicially construed to require that a corporation be 'doing business' in the State to justify the conclusion that the corporation was sufficiently 'present' so that it could be served in the same manner as other resident corporations." *St. Louis-S. F. Ry. v. Gitchoff*, 68 Ill.2d 38, 43, 11 Ill.Dec. 598, 600, 369 N.E.2d 52, 54 (1977). This construction effectively permits the exercise of *in personam* jurisdiction by the Illinois courts over nonresident private corporations to the extent permitted by the Due Process Clause of the Fourteenth Amendment.

The due process test for a state's extensions of personal jurisdiction over a nonresident defendant is that the defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). It has also been said that "[t]he amount and kind of activities which must be carried on by the foreign corporation in the state of the forum so as to make it reasonable and just to subject the corporation to the jurisdiction of that state are to be determined in each case." *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445, 72 S.Ct. 413, 418, 96 L.Ed. 485 (1952), quoted in *Braband v. Beech Aircraft Corp.*, 72 Ill.2d 548, 556, 21 Ill.Dec. 888, 893, 382 N.E.2d 252, 255 (1978), *cert. denied*, 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979).

The Arab Wings motions to dismiss now pending before me have been briefed with greater emphasis given to the New York actions and to Arab Wings' contacts with New York. Arab Wings' contacts with Illinois have been given less emphasis, apparently on the assumption that Arab Wings' jurisdictional status in the Illinois actions stands or falls upon the determination of its status in the New York actions. The record discloses that Arab Wings does not do business in its own name in Illinois. ALIA, however, does do business and is actually present in Illinois and concedes to jurisdiction there. There is no evidence that an ALIA employee actively participates in the chartering of Arab Wings aircraft by potential Illinois clients as does ALIA's New York employee, referred to in the discussion of the New York actions above. Thus, Arab Wings cannot presump-

tively be said to be doing business in Illinois through the agency of ALIA. Nevertheless, it remains true that Arab Wings and ALIA, as discussed above in relation to the New York actions, operate with sufficient indicia of corporate intimacy so as to consider Arab Wings a "mere department" of ALIA. Arab Wings is, therefore, jurisdictionally present wherever ALIA is present and has the requisite "minimum contacts" with Illinois to sustain the imposition of *in personam* jurisdiction over Arab Wings by its courts.

SO ORDERED.