TRIPMASTERS, INC., Plaintiff,

v.

HYATT INTERNATIONAL CORPORA-TION and the Acapulco Continental Hotel, Defendants.

No. 82 Civ. 6792 (JFK).

United States District Court,
S.D. New York.

Sept. 27, 1988.

Patrick H. Barth, New York City, for plaintiff.

Elliot Schnapp, New York City (Mangone & Schnapp, of counsel), for defendants.

## ORDER

KEENAN, District Judge:

On May 24, 1988, the Court received the annexed Report and Recommendation of the Honorable Sharon E. Grubin, United States Magistrate. Plaintiff has filed written objections pursuant to 28 U.S.C. § 636(b)(1); Local R. Mag. P. 7. Defendant has relied on its initial motion papers in response to plaintiff's objections. After a thorough review of all submissions and the

Report, I hereby adopt the Report as the opinion of this Court.

SO ORDERED.

## REPORT AND RECOMMENDATION TO THE HONORABLE JOHN F. KEENAN

SHARON E. GRUBIN, United States Magistrate:

This diversity action concerns an alleged contract for hotel accommodations in 1981 between plaintiff, a New York travel agency which arranges group tours, and defendants Acapulco Continental Hotel ("ACH") and Hyatt International Corporation ("HIC"). Plaintiff alleges that defendants breached an agreement for ACH to host one of plaintiff's tour programs. Pending before the court is a motion by ACH for dismissal on the ground of lack of personal jurisdiction. ACH argues that it is not subject to jurisdiction as it is owned and operated by Mexican corporations and sued herein as a result of business transactions that occurred solely in Mexico. Plaintiff argues that ACH is subject to this court's jurisdiction both because it "does business" here in New York and because it "transacted business" here from which the claim herein arises. The parties have engaged in full discovery on the jurisdictional issue and agreed to submit the motion on stipulated facts without an evidentiary hearing.

For the reasons set forth below, I respectfully recommend that your Honor grant defendant ACH's motion because I find no basis for jurisdiction.[1]

### FACTS

The factual setting from which the parties draw opposite legal conclusions as to jurisdiction is basically undisputed and may be summarized as follows. Defendant ACH, a hotel in Acapulco, Mexico, is owned by Compania Operadora la Joya de Acapulco, S.A. ("la Joya"), a Mexican corporation with its principal place of business in Mexico. ACH is operated by Hoteles Exelaris, S.A. ("Exelaris") pursuant to a management agreement between Exelaris and la Joya. Exelaris is also a Mexican corporation with its principal place of business in Mexico. At no time relevant for the purposes of this motion did ACH maintain any bank, brokerage or other financial account in New York, have any interest in real property in New York, have any office in New York, have any business dealings with any New York media advertisers or send any representatives to New York for any business function. Similarly, neither the hotel's owner la Joya nor its management

---

1. The papers submitted on this motion consist of the following. Abbreviations in parentheses denote the manner by which these documents will be designated in this report.

   (1) Memorandum of Law in Support of Motion by Defendant Acapulco Continental Hotel to Dismiss the Complaint for Lack of Personal Jurisdiction, dated August 7, 1987;

   (2) Plaintiff's Memorandum of Law, dated August 11, 1987;

   (3) Reply Memorandum in Support of Motion by Defendant Acapulco Continental Hotel to Dismiss the Complaint for Lack of Personal Jurisdiction, dated August 21, 1987;

   (4) Plaintiff's Memorandum of Law, dated August 24, 1987;

   (5) Stipulation of Facts, dated August 11, 1987 ("S.F."), with annexed exhibits as follows:

   *Exhibit A:* Management Agreement for the Hotel Acapulco Continental, dated May 2, 1980 ("Ex. A");

   *Exhibit B:* Shareholders' Agreement, dated October 24, 1979 ("Ex. B");

   *Exhibit C:* Contract of Services of Advisorship, dated October 24, 1979 ("Ex. C");

   *Exhibit D:* Telex from Manuel de la Garza to Neil Rothenberg, dated July 17, 1980 ("Ex. D");

   *Exhibit E:* Telex from Neil Rothenberg to Alberto del Hoyo, Gilberto Membreno and Manuel de la Garza, dated July 23, [1980] ("Ex. E");

   *Exhibit F:* Telex from Gilberto Membreno to Neil Rothenberg, dated July 30, 1980 ("Ex. F");

   *Exhibit G:* Deposition of Paul H. Novy, September 15, 1983 ("Novy Dep.");

   *Exhibit H:* Notice to Take Deposition, dated April 15, 1983;

   *Exhibit I:* Defendant Acapulco Continental Hotel's Answers to Interrogatories, sworn to September 23, 1985 ("ACH Int.");

   *Exhibit J:* Agreement between Exelaris Hyatt Continental Acapulco and Liberty Travel, dated December 10, 1984;

   *Exhibit K:* Affidavit of Neil Rothenberg, sworn to September 11, 1984 ("Rothenberg Aff.");

   (6) Affidavit of Guillermo Buenrostro in Support of Motion for Relief from Final Judgment Entered Against Acapulco Continental Hotel, sworn to August 15, 1984 (portions annexed as Exhibit A to Defendant ACH's Memorandum of Law in Support of Motion, dated August 7, 1987; *see also* Docket Entry 31) ("Buenrostro Aff.").

Exelaris has any offices, accounts or telephone listings in New York. (S.F. 1–3; ACH Int. 1, 5–11; Buenrostro Aff. ¶¶ 85, 86.)

The stock of Exelaris is owned by two corporations. Fifty-one percent is owned by Valores Industriales, S.A., a publicly-held Mexican corporation. Valores is also the owner of a separate subsidiary company (not specified by name in the record) which is the controlling shareholder of la Joya. The other forty-nine percent of Exelaris is owned by Hyatt International Corporation (Mexico) ("HIC(M)"). HIC(M) is a fully-owned subsidiary of Hyatt International Corporation (Delaware) ("HIC(D)") which, in turn, is a fully-owned subsidiary of defendant HIC. All three of these Hyatt corporations are Delaware corporations with their principal places of business in Chicago, Illinois. Throughout their papers the parties generally refer to "Hyatt" or "HIC" without differentiating as to which of the various entities they refer. For this reason and for the reason that on this motion all facts are to be construed in favor of the plaintiff, I have deemed these three companies as one for purposes of this motion and use "HIC" herein to refer to this conglomeration as one entity except where otherwise indicated.[2] Valores and HIC(M) hold their stock in Exelaris pursuant to a shareholders' agreement executed in October 1979. Under this agreement HIC(M) had the right for five years to maintain operating control of hotels managed by Exelaris and to propose candidates from which Exelaris was required to select its "Director General" who is apparently its chief operating executive. The agreement also provides Exelaris with a right of first refusal for operation of any new hotels in Mexico developed, operated or owned by HIC(M) or affiliated HIC companies and prohibits HIC(M) from operating any hotels in cities in Mexico where Exelaris already operates one.[3] (S.F. 3–4, 6–8; Novy Dep. at 6–14; Ex. B.)

Exelaris manages ACH pursuant to a written management agreement with ACH's owner la Joya. This agreement, negotiated in Mexico with the assistance of an HIC representative from Chicago and patterned after a standard HIC management agreement, incorporates HIC's unspecified "standards of quality" for hotels bearing the "Hyatt" name. However, Exelaris did not need HIC's permission to enter into this agreement with la Joya and HIC is not a party to this agreement. (S.F. 2; Novy Dep. at 18–25, 28; Ex. A.) The agreement, entered into in May 1980, provided that la Joya would perform certain alterations, additions and improvements to the already existing hotel by December 15, 1981 to render the hotel qualified for the "5-Star" hotel classification of the Mexican Ministry of Tourism. HIC was not required to be consulted with regard to this work, but, upon completion of the work and HIC's inspection thereof, ACH's name was to be changed to include the name "Hyatt," with the understanding that such name was the exclusive property of HIC. La Joya pays a fee for the use of the Hyatt name pursuant to a separate license agreement. (ACH's name was changed to "Hyatt Continental" on April 2, 1981 and to "Exelaris Hyatt Continental Acapulco" in May 1981.) Under the agreement la Joya is required to maintain various kinds of insurance, which it does independently of

---

**2.** This construction would also seem to be appropriate given the functioning of these various corporations which appears to be as follows. Defendant HIC is engaged in the business of managing two hotels, the United Nations Plaza Hotel in New York and the Hyatt Regency in Vancouver, and of holding the shares of its subsidiary HIC(D). HIC(D) is engaged in the business of managing two other hotels, the Hyatt Regency in Montreal and the Hyatt Regency in Kuwait, and of holding the shares of a number of subsidiaries including HIC(M). HIC(M) is engaged in the business of simply holding forty-nine percent of the shares of Exelaris. The offices of HIC, HIC(D) and HIC(M) all appear to be at the same location in Chicago. HIC and HIC(D) apparently share the same president and employees; HIC(M) has a different president, but apparently no employees. (See Novy Dep. at 6–13, 27, 51–52.)

**3.** Apparently Exelaris then operated at least one other hotel affiliated with HIC in Mexico, the Hyatt Regency Acapulco Hotel, and the "Director General" of Exelaris was also the manager of the Hyatt Regency Acapulco Hotel (S.F. 5; Novy Dep. at 29, 42; Ex. B at cl. Sixth).

any other hotels operated by Exelaris or HIC. All hotel staff are employees of la Joya, not Exelaris or HIC. La Joya pays Exelaris three percent of ACH's revenues as a basic management fee plus an additional ten percent of ACH's "gross operating profit" as an incentive fee. (S.F. 11; ACH Int. 2, 16, 17; Novy Dep. at 37–41, 43; Buenrostro Aff. ¶ 82 n. *; Ex. A. at Art. I § 2, Art. IV §§ 1, 2, Art. VIII.)

This management agreement between Exelaris and la Joya refers to a separate agreement between Exelaris and Hyatt of Hong Kong Limited ("Hyatt H.K."), yet another Hyatt corporation, whereby Hyatt H.K. is to provide to Exelaris the "Group Services and Benefits generally made available by [HIC] to owners of hotels throughout the world bearing the Hyatt name" (Ex. A at p. 1). The management agreement provides that Exelaris shall provide the hotel with these "Group Services and Benefits," which are defined as "inter-hotel reservation, convention and business promotion, sales promotion, publicity, public relations, and all other group benefits, services and facilities including joint advertising programs to the extent appropriate furnished to other hotels owned or operated by [Exelaris] or [HIC] and its affiliated companies." (*Id.* at Article VII § 2.) Hyatt H.K. is another fully owned subsidiary of HIC(D), incorporated and having its principal place of business in Hong Kong with no employees in the United States. Hyatt H.K. specializes in providing "advisorship" services in the administration and

operation of hotels under HIC's "standards." The contract between Exelaris and Hyatt H.K. provides that for these services of Hyatt H.K., Exelaris is to pay Hyatt H.K. 75 percent of Exelaris' net revenues, which amount includes all royalties owed by Exelaris for use of Hyatt names and trademarks (pursuant to the separate license agreement not submitted by the parties) as well as the 49 percent share of profits due HIC(M) as shareholder in Exelaris. (S.F. 10; Novy Dep. at 25–27, 50; ACH Int. 5(f); Ex. B at ¶ II; Ex. C.)[4]

Your Honor may be wondering by now what all of the above has to do with the state of New York. The answer (according to plaintiff) is that included in the "Group Services and Benefits" provided to the hotel by Exelaris pursuant to its contract with Hyatt H.K. is participation in HIC's "Worldwide Sales Office" in New York City and in HIC's toll-free "800" telephone reservation system. The "Worldwide Sales Office" is located in office space leased by HIC and has a small number of employees and a listed New York telephone number. This office performs services primarily for hotels bearing the "Hyatt" name in the United States but provides limited information to consumers regarding group tours and conventions at hotels outside the United States and appears to have worked on ACH's behalf in the following way. When this New York office received an inquiry about a potential group or convention at ACH, that office would not take any reservations or make any commitments, but

4. In an attempt at what I hope is clarity for purposes of the further discussion herein I have drawn the following chart showing the relationships of the various entities described above:

rather would contact HIC's Chicago office. The Chicago office would then telex ACH directly to determine whether accommodations were available and relay the information back to the New York office which then passed it on to the inquiring customer who would take any further steps directly with the hotel. The office neither makes nor confirms reservations for ACH, instead referring persons wishing to make reservations directly to the appropriate person at the hotel itself. From February 1980 through part of 1982, the work of one employee in the Worldwide Sales Office related solely to Hyatt hotels in Mexico, and, according to the parties, Exelaris paid that employee's salary, charging back a proportionate share to each of the Hyatt hotels in Mexico. (S.F. 12–15; ACH Int. 5; Buenrostro Aff. ¶¶ 88–89.)

According to la Joya's Controller, ACH paid to HIC a fixed monthly fee for the services of the Worldwide Sales Office (Buenrostro Aff. ¶ 89). It is unclear whether the fee referred to is one paid directly to HIC or is part of the fee paid to Exelaris under the management agreement with Exelaris who, in turn, paid Hyatt H.K. under their separate agreement for provision of Group Services and Benefits. Interrogatory Answer 5(f), verified by the same individual, states that Exelaris' payment of a percentage of net profits to Hyatt H.K. for services includes participation in the Worldwide Sales Office. It is also unclear whether the parties' stipulation that Exelaris paid the salary of the employee at the Worldwide Sales Office who was responsible solely for the Mexican hotels (S.F. 14) refers to a direct payment to that employee or, again, as a part of the amounts owed to Hyatt H.K.

ACH also "participated" in the Hyatt toll-free "800" telephone reservation system. As plaintiff points out, this system is available to New York residents, although no more nor less than to everyone across the United States. The number connects to an office in Omaha, Nebraska where employees will tentatively accept reservations for persons wishing them at ACH, but all such reservations must be confirmed directly with the hotel by telex. La Joya's Controller states that ACH pays HIC a fixed monthly fee (again, presumably referring to the payments owed Hyatt H.K.), while HIC's Senior Vice–President says that the telephone system was not among the "Group Services and Benefits" which HIC was obligated to supply, but that it was made available to ACH "gratis." (S.F. 15; ACH Int. 12; Buenrostro Aff. ¶ 87; Novy Dep. at 37.)

Finally, turning to the alleged contract underlying the dispute herein, negotiations were had in person in Mexico between plaintiff's representative from New York and ACH and by telephone conversations and telexes between plaintiff in New York and ACH in Mexico (Rothenberg Aff. ¶ 3; Buenrostro Aff. ¶ 83; Exs. D–F). In particular, plaintiff alleges a binding contract was formed by virtue of a telex of July 17, 1980 from ACH's representative in Mexico to plaintiff in New York and plaintiff's responsive telex of July 23, 1980.[5] There is no allegation that plaintiff ever contacted the HIC Worldwide Sales Office in New York or made use of the toll-free "800" telephone system.

## DISCUSSION

In a diversity action, the scope of *in personam* jurisdiction is defined by the law

---

**5.** The telex from ACH stated, in part:
  As per our phone conversation of today, I am reconfirming that the Continental Hotel is willing to operate your 'Passover Program 1981' for a minimum of 200 rooms....
  *       *       *       *       *       *
  All the details are to be discussed and negotiated by your executives coming to Acapulco in a few days.
  Kindly reconfirm your acceptance of the above by return telex and pls let us know dates of arrival of your executives to Acapulco.

(Ex. D.) Plaintiff's responsive telex the following week inquired as to the availability of 350–400 rooms and asked a series of questions concerning amenities at the hotel. It stated, in part:
  Our executives will be arriving in Acapulco to finalize the above with you in a few days. Please reserve the rooms for us immediately.
(Ex. E.) One week thereafter, ACH sent a telex to plaintiff stating, "Further to our today's conversation I very much regret to confirm our inability to operate your Passover Program" (Ex. F).

of the forum state. *Welinsky v. Resort of the World D.N.V.*, 839 F.2d 928, 929 n. 2 (2d Cir.1988); *Arrowsmith v. United Press International*, 320 F.2d 219, 223 (2d Cir. 1963) (en banc). Sections 301 and 302(a)(1) of the Civil Practice Law and Rules of the state of New York ("CPLR") provide the bases upon which we may exercise personal jurisdiction over foreign defendant ACH.

On a motion to dismiss for lack of jurisdiction, the pleadings and affidavits are to be construed in the light most favorable to the plaintiff. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985); *Bialek v. Racal–Milgo, Inc.*, 545 F.Supp. 25, 33 (S.D.N.Y.1982). In response to such a motion prior to an evidentiary hearing, "the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials," *Stone v. Chung Pei Chemical Industry Co.*, 790 F.2d 20, 22 (2d Cir.1986) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981)), although eventually it is a plaintiff's burden to establish jurisdiction by a preponderance of the evidence at a hearing or at trial, *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984); *Marine Midland*, 664 F.2d at 904. After reviewing the affidavits, stipulated facts and other evidentiary materials, as well as the arguments of counsel, I find that the motion should be granted at this time because plaintiff has failed to make even a *prima facie* showing of jurisdiction. It should be noted that while I believe plaintiff has failed to meet this initial lesser burden required in answer to the motion, plaintiff should be held at this time to its ultimate burden of a preponderance of the evidence. Plaintiff has been allowed full discovery and the only reason no evidentiary hearing was held is that the parties offered to submit the motion on stipulated facts in lieu of a hearing.

CPLR § 301, covering "traditional" bases of jurisdiction, provides that "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." Under the classic standard for determining a foreign entity's amenability to suit under § 301, plaintiff must show that ACH has "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Simonson v. International Bank*, 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 436, 200 N.E.2d 427, 429 (1964), *quoted in Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir.1983). Each case must be decided on its own facts, *MacInnes v. Fontainebleau Hotel Corp.*, 257 F.2d 832, 833 (2d Cir.1958), and the relevant factors to be considered include "the existence of an office in New York; the presence of bank accounts and other property in the state; the solicitation of business in the state; and the presence of employees of the foreign defendant in the state." *Berk v. Nemetz*, 646 F.Supp. 1080, 1083 (S.D.N.Y.1986). However, the "mere solicitation of business" does not constitute doing business; some additional activities are required. *See, e.g., Cohen v. Vaughan Bassett Furniture Co.*, 495 F.Supp. 849, 850–51 (S.D.N.Y.1980) (citing *Miller v. Surf Properties, Inc.*, 4 N.Y.2d 475, 480, 176 N.Y.S.2d 318, 321, 151 N.E.2d 874, 876 (1958)). *See also Savoleo v. Couples Hotel*, 136 A.D.2d 692, 524 N.Y.S.2d 52 (2d Dep't 1988).

CPLR § 302(a), the "long-arm" statute, provides for jurisdiction over a foreign defendant who "transacts any business" within the state provided that the cause of action arises from such transaction of business. This provision requires fewer overall contacts with New York than does § 301 and focuses on whether, under the "totality of the circumstances," *Sterling National Bank & Trust Co. of New York v. Fidelity Mortgage Investors*, 510 F.2d 870, 873 (2d Cir.1975), the nonresident has engaged in purposeful activity in New York thereby invoking the benefits and protections of New York law, *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 456–58, 261 N.Y.S.2d 8, 18–19, 209 N.E.2d 68, 75–76, *cert. denied*, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965). *See also CutCo Industries v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986).

Plaintiff appears to argue that personal jurisdiction exists over ACH on three bases. I say "appears to argue" because it has been necessary to attempt to make some sense from plaintiff's briefs which are rambling, conclusory flag-wavings that I believe distort both the proof and well-established principles of law.[6] Plaintiff argues that ACH was "doing business" in New York under CPLR § 301 on two theories and, in addition, that it "transacted business" here sufficiently to meet the requirements of CPLR § 302(a)(1). We will address each theory below.

### 1. ACH's "doing business"

Plaintiff first contends that the presence of that employee of the HIC Worldwide Sales Office in New York who performed services exclusively related to hotels in Mexico bearing the Hyatt name and whose salary was paid in part by ACH was a substantial and continuous contact with this state sufficient to constitute ACH's "doing business" under CPLR § 301.

The leading New York case dealing with personal jurisdiction respecting a foreign hotel in *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). At issue in *Frummer* was jurisdiction over a British corporation, Hilton Hotels (U.K.) Ltd. ("Hilton U.K.") which operated the London Hilton Hotel where the plaintiff claimed to have been injured in a fall. Hilton U.K. was owned by Hilton Hotels International, a Delaware corporation admittedly doing business in New York, which was in turn owned by Hilton Hotels Corporation, also a Delaware corporation doing business in New York. Hilton Hotels Internationl and Hilton Hotels Corporation jointly owned Hilton Credit Corporation which provided credit card financing and distribution and a "Hilton Reservation Service" in New York and elsewhere. Hilton Credit Corporation had a New York office, New York bank account and New York telephone number. The New York office of Hilton Credit Corporation did publicity work and helped to generate business for the London Hilton. In addition, it accepted and confirmed room reservations at the London Hilton. The New York Court of Appeals found jurisdiction over the British corporation based on the presence of the Hilton Credit Corporation here which the court deemed the agent of the hotel by virtue of the activities the New York office carried out. The court emphasized that this New York office both accepted and confirmed room reservations at the London hotel and concluded, in language that has been repeated and followed in case after case since then:

> In short—and this is the significant and pivotal factor—the Service does all the business which Hilton (U.K.) could do were it here by its own officials.

19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 854. The Court of Appeals in *Frummer* distinguished the facts of that case from those of an earlier decision it had rendered in *Miller v. Surf Properties, Inc.*, 4 N.Y.2d 475, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958), where it had refused to find that a Florida hotel was "doing business" in New York when an independent New York partnership travel agency, holding itself out as the New York office of the defendant hotel, represented the hotel as well as other hotels by soliciting business and taking reservations subject to confirmation by the hotel. The *Frummer* court also pointed to its more recent decision in *Bryant v. Finnish National Airlines*, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965), which plaintiff herein offers as support for its position, where jurisdiction

---

**6.** See, for example, plaintiff's four-page surreply Memorandum of Law dated August 24, 1987 which, although no permission was sought for filing, plaintiff apparently felt a necessity to submit in order to argue that "A rose is a rose, [sic] is a rose" (p. 1) (because ACH uses the Hyatt name) and that "[t]he answer to the question 'Who is on First?' is Hyatt and ACH and the bag is located in New York State" (p. 4). It is a mystery to me why counsel whom I believe to be otherwise competent would submit papers such as these, but perhaps it is in keeping with the old adage that when you have the facts on your side, argue the facts; when you have the law on your side, argue the law; and when you have neither. . . .

was found over a foreign airline corporation. In *Bryant,* the defendant itself maintained an office in New York, had a bank account here and employed several people at the office who did public relations work, including maintaining contacts with other airlines and travel agencies and helping to generate business. Although the office took requests for airline reservations but did not have the authority to confirm them or sell tickets, the court had found all the other activities of the New York office sufficient to afford a basis for jurisdiction. In *Frummer* where, unlike *Bryant,* the London Hilton did not *itself* maintain an office in New York, the Court of Appeals found that the Hilton Credit Corporation's office here provided the same services for the foreign defendant that the New York office of the defendant in *Bryant* provided but, moreover, performed the additional important function of accepting and confirming room reservations at the London hotel. 19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 853.

Shortly after the *Frummer* decision, the Second Circuit issued *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116 (2d Cir. 1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968), in which it found jurisdiction over foreign tour operator defendants who were members of a nonprofit travel services corporation whose independent New York sales representative generated three-sevenths of the foreign corporations' business and booked confirmed reservations on behalf of defendants in New York. Resting its opinion on *Frummer,* the Second Circuit stated that "[i]n our view, the decisive test is that upon which the court in *Frummer* relied, 'the [reservation] Service does all the business which [defendant corporation] could do were it here by its own officials.'" 385 F.2d at 120–21.

In the context of the *Frummer* case, we take this to mean that a foreign corporation is doing business in New York "in the traditional sense" when its New York representative provides services beyond "mere solicitation" and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.

*Id* at 121. The court went on to find that the record clearly showed that were it not for this New York representative, the foreign defendants would have had either to open their own reservation office in New York or give up the tours at issue. The Second Circuit concluded:

Since [the New York representative] confirmed the tour reservations in New York and in addition maintained a broad range of services similar to those of Hilton Reservation Service or the New York office of defendant corporation in the *Bryant* case ... [the New York representative] was acting as an agent for [defendants] to a sufficient extent to satisfy the doing business test as stated by the New York Court of Appeals in the *Frummer* case.

*Id.* Subsequent decisions have strictly followed the *Frummer* standard of whether the activities performed in New York on behalf of a foreign defendant constitute all the business which the defendant itself could do if here by its own officials and, in particular, focused upon the question of whether the New York representative has the authority to make confirmed reservations on behalf of the foreign defendant. Thus, in *Kopolowitz v. Deepdene Hotel & Tennis Club,* 464 F.Supp. 677 (S.D.N.Y. 1979), Judge Duffy wrote:

According to [defendant], the authority to confirm reservations, present in both the *Frummer* and *Gelfand* cases but not in the case at bar, is a critical factor which distinguishes those cases from the instant one. In fact, the pivotal consideration for finding jurisdiction in these travel service cases is whether the travel service does all the business which the foreign corporation could do here by its own officials. If the foreign corporation holds back from its representative the power to confirm reservations it seems that the travel service is not doing all the business which the corporation could itself do.

464 F.Supp. at 679 (citation omitted). Judge Duffy went on to find jurisdiction lacking in *Kopolowitz* where the New York representative lacked the authority to confirm reservations, even though other extensive services were performed—the New York representative, receiving fees and commissions from the defendant, booked 90 percent of the hotel's business yearly, promoted the hotel with travel agents and the general public, handled inquiries and requests for reservations and distributed over 50,000 hotel brochures. Indeed, the New York agent's authority with respect to reservations stopped just short of full authority, confirming space without first contacting the hotel but maintaining weekly consultations with the hotel to avoid overbooking. The *Frummer* test and the focus on the authority of the New York representative to make and confirm reservations was very recently reaffirmed by the Second Circuit in *Welinsky v. Resort of the World D.N.V.*, 839 F.2d 928 (2d Cir.1988). *See also Oliver Engebretson, Inc. v. Aruba Palm Beach Hotel & Casino*, 587 F.Supp. 844 (S.D.N.Y.1984) (foreign hotel found to be doing business in New York through local independent travel agent who had authority to confirm reservations).

■ While an inability to confirm reservations may not in all instances be fatal to jurisdiction, it is beyond doubt that no jurisdiction will lie unless the foreign defendant's New York representative somehow nevertheless satisfies *Frummer*'s requirement that it engage in all the activities the foreign entity could do here by its own officials. *See Jayne v. Royal Jordanian Airlines Corp.*, 502 F.Supp. 848, 856–59 (S.D.N.Y.1980). In this context, plaintiff's contention herein that ACH did business in New York within the meaning of CPLR § 301 through the HIC Worldwide Sales Office must be rejected. Unlike the defendant in *Bryant v. Finnish National Airlines*, upon which plaintiff relies, ACH itself had no office, no bank account and no employees in New York. Rather, ACH had in New York an HIC employee at the Worldwide Sales Office who represented its interests along with the interests of other Mexican "Hyatt" hotels, whose salary it paid in part apparently through Exelaris and whose functions with respect to ACH consisted solely of providing information about group tours and conventions.[7] This office had no power to confirm or even take requests for reservations. It would answer inquiries with information about the hotel, including possible availability which it would learn from the Chicago HIC office which learned it from ACH, and would refer persons wishing to make any reservations directly to the hotel. Its functions, moreover, were limited to providing information solely about group tours or conventions, and it did not handle inquiries relating to potential individual customers or other matters. Individuals desiring reservations could use the toll-free "800" reservation service answered in Omaha, Nebraska. Even the Omaha office only had the authority to tentatively accept reservations subject to ACH's direct confirmation by telex.[8] Furthermore, unlike the situation in *Frummer*, where the owner of the foreign hotel was also the owner of the agent in New York[9] and, moreover, the owner of the hotel itself admittedly did business in New York, we have here a foreign hotel owned by a 100% Mexican corporation and operated, for a fixed fee, by another Mexican corporation whose ma-

---

**7.** Even if we deem the employee responsible for the Mexican hotels as somehow an ACH employee, as plaintiff would have it, rather than an employee of HIC (see pages 928–29, *supra*), it would not change matters because the limitation on this person's authority to "do business" is the critical element in issue, not by whom the person's salary was paid.

**8.** Even if there were a toll-free number in New York exclusively for ACH rather than all Hyatt hotels and even if it were answered directly by ACH in Mexico rather than in Omaha, the listing or "presence" of such number in New York would still constitute only "mere solicitation" insufficient to provide jurisdiction. *See, e.g., Ziperman v. Frontier Hotel of Las Vegas*, 50 A.D.2d 581, 582, 374 N.Y.S.2d 697, 700 (2d Dep't 1975).

**9.** The *Frummer* court stated that the fact that the foreign hotel and the New York agent were commonly owned was significant in that it gave rise to a valid inference as to the broad scope of the agency. 19 N.Y.2d at 538, 281 N.Y.S.2d at 45, 227 N.E.2d at 854.

jority shareholder is still another Mexican corporation.

It is thus abundantly clear that this New York office does not do all the business which ACH (or its owner, la Joya, or operator, Exelaris) could itself do if it had an office here. Rather, its functions are extremely limited, amounting to "little more than rendering telephone service and mailing brochures." *Miller v. Surf Properties, Inc.*, 4 N.Y.2d at 481, 176 N.Y.S.2d at 322, 151 N.E.2d at 877. These types of activities, providing "mere solicitation" in New York for ACH, are insufficient to establish a "continuous and systematic course of 'doing business' here" as to warrant a finding of jurisdiction over ACH. *Welinsky v. Resort of the World D.N.V.*, 839 F.2d at 929; *Simonson v. International Bank*, 14 N.Y. 2d at 285, 251 N.Y.S.2d at 436, 200 N.E.2d at 429.

2. *ACH's "doing business" through HIC*

■ Plaintiff's second argument under CPLR § 301 is that "ACH was also doing business in New York through the defendant Hyatt which has not contested *in personam* jurisdiction." (Plaintiff's Memorandum of Law, dated August 11, 1987, at 14.) Plaintiff asserts that ACH and HIC "are so intertwined that they are in fact one vis-a-vis the outside world." (*Id.* at 15.) Although not clearly articulated by the parties, the issue to be determined is whether HIC's presence in New York can be imputed to ACH by virtue of the relationship between the two entities.

This type of issue mostly arises in the context of a foreign parent corporation over which jurisdiction is sought by virtue of a subsidiary's doing business in New York, although the analysis by which the courts assess the situation for jurisdictional purposes is the same whether it is the parent or the subsidiary over which jurisdiction is sought by reason of the other's presence here. *See Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65, 67 n. 5 (S.D.N.Y.1979); *Freeman v. Gordon & Breach, Science Publishers, Inc.*, 398 F.Supp. 519, 521 (S.D.N.Y.1975). A foreign corporation may be found to be present in

New York for jurisdictional purposes if (1) the relationship between the foreign corporation and the local one gives rise to a valid inference of an agency relationship or (2) the day-to-day control by the parent of the subsidiary is so complete that the subsidiary is, in fact, "merely a department" of the parent. *Bialek v. Racal–Milgo, Inc.*, 545 F.Supp. 25, 32 (S.D.N.Y.1982); *Bulova Watch Co. v. K. Hattori & Co.*, 508 F.Supp. 1322, 1334 (E.D.N.Y.1981); *Bellomo v. Pennsylvania Life Co.*, 488 F.Supp. 744, 745 (S.D.N.Y.1980); *Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. at 67 *Oostdyk v. British Airtours Ltd.*, 424 F.Supp. 807, 814 (S.D.N.Y.1976); *Freeman v. Gordon & Breach, Science Publishers, Inc.*, 398 F.Supp. at 521–22. The agency analysis under the first prong of this standard is the *Frummer*-type analysis we have already discussed above which, for the reasons indicated, does not provide jurisdiction over ACH. Nor does the second prong of the test, the "control" theory, produce a different result.

The leading New York case of *Delagi v. Volkswagenwerk AG of Wolfsburg, Germany*, 29 N.Y.2d 426, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972), involved a German corporation ("VWAG") which exported automobiles to the United States through its wholly owned subsidiary, Volkswagen of America, Inc. ("VWA"), a New Jersey corporation which, in turn, resold the automobiles to wholesale distributors franchised by VWA, including World–Wide Volkswagen Corp. ("World–Wide") in New York State. World–Wide, after purchasing automobiles from VWA, sold them to local dealers in its franchise area. The capital stock of World–Wide and its New York franchised dealers was owned by United States investors unrelated to VWA or VWAG. Plaintiff argued that jurisdiction was properly acquired over VWAG by reason of a rigid control it exerted over its New York distributor World–Wide and the franchised New York dealers by requiring sale of a minimum number of automobiles by each dealer, uniform design for service departments, service personnel to be trained by VWAG in Germany, uniform prices for purchase and sale, and approval

by VWAG of prospective dealers. The New York Court of Appeals rejected the contention, stating that "this court has never held a foreign corporation present on the basis of control, unless there was in existence at least a parent-subsidiary relationship." 29 N.Y.2d at 432, 328 N.Y.S.2d at 657, 278 N.E.2d at 897. The court, referring to its earlier decision in *Public Administrator of the County of New York v. Royal Bank of Canada*, 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967), continued:

> The control over the subsidiary's activities, we held, must be so complete that the subsidiary is, in fact, merely a department of the parent. Even if World–Wide were a subsidiary of VWAG, which it is not, the alleged control activities of VWAG would not be sufficient to make World–Wide a mere department of VWAG.

29 N.Y.2d at 432, 328 N.Y.S.2d at 657, 278 N.E.2d at 897 (citation omitted). In *Public Administrator of the County of New York*, the Court of Appeals had found jurisdiction in New York over a branch of a bank in France whose parent did business in New York where the record showed that the French branch was not merely a subsidiary of the parent but, in fact, the same entity because "the Royal Bank of Canada (France) was nothing more than the name under which the defendant Royal Bank of Canada did business in France." 19 N.Y. 2d at 131, 278 N.Y.S.2d at 381, 224 N.E.2d at 879.

More recently the Second Circuit had occasion to examine the question of whether the relationship between a German corporation and its wholly-owned subsidiary located in New York was such as to provide jurisdiction over the parent under New York law in *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117 (2d Cir.1984). The court noted that "mere ownership" was not enough to permit New York to assert jurisdiction over the parent:

The officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over the subsidiary corporation and the discharge of that supervision alone is not enough to subject the parent to New York jurisdiction. However, when the activities of the parent show a disregard for the separate corporate existence of the subsidiary, New York jurisdiction may be asserted.

751 F.2d at 120 (citation omitted). The court then set forth the framework for the determination of when New York jurisdiction can be asserted over a foreign corporation through the presence of an affiliated corporation:

New York courts regard one factor as essential to the assertion of jurisdiction over a foreign related corporation and three others as important. The essential factor is common ownership. While jurisdiction has been found in cases other than a classic parent-subsidiary relationship, *nearly identical ownership interests must exist* before one corporation can be considered a department of another corporation for jurisdictional purposes.

*Id.* (emphasis added) (citations omitted).[10]

In the case before us, of course, we do not even have that "essential" element of control by HIC over ACH of common ownership. ACH is not a subsidiary of HIC nor are their ownerships connected in any way. ACH is not a corporation but an asset of la Joya, a Mexican corporation wholly unrelated to HIC. It is difficult to understand on what basis plaintiff rests its argument that jurisdiction must be found over ACH because of HIC's presence in New York. At one point in its brief plaintiff asserts that "Hyatt is either a joint venturer with ACH, a partner with ACH, or an agent of ACH" (Plaintiff's Memorandum of Law, dated August 11, 1987, at 2), but there is no explanation of what plaintiff means by these loosely used alternative terms, nor is there support offered to sus-

---

**10.** The court stated the three other "important" factors to be the financial dependency of the subsidiary on the parent, the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities and the degree of control exercised over marketing and operational policies. 751 F.2d at 120–22.

tain a finding for any such position. Plaintiff's argument is set forth as follows:

Exelaris is controlled by Hyatt. This is the case despite the minority position because of the shareholders' agreement. Hyatt has veto authority over contracts and its designated manager runs Exelaris. The ownership of the hotels, we recognize, is separate from the operation. However, in this case, the majority (and controlling) shareholder of the company which owns the hotel is [Valores]. Common ownership of the ACH and the Hyatt Regency Acapulco[11] was conceded by Mr. Novy [HIC's senior vice-president]. The same deponent conceded that [Valores] and Hyatt were in a joint venture pertaining to Exelaris.

The Hyatt control extends beyond the above: the ACH, like all Hyatt hotels, has to fulfill certain standards of quality and atmosphere. The ACH benefits from group services. Each participant is receiving a monetary gain. Hyatt receives a "fee"; the hotel a profit. The entities are so intertwined that they are in fact one vis-a-vis the outside world.

\* \* \* \* \* \*

Exelaris is, in fact, Hyatt insofar as this plaintiff is concerned. Perhaps ACH has a claim against Hyatt if the plaintiff succeeds in this case. That is not the plaintiff's concern. The business relationship between the defendants was theirs to structure and it was structur[ed] as a partnership.

(Plaintiff's Memorandum of Law, dated August 11, 1987, at 15, 17.) The argument thus appears to be that jurisdiction exists in New York over ACH because of HIC's relationship to Exelaris, the Mexican corporation which manages the hotel and in which HIC is the 49% minority shareholder, because HIC controls Exelaris and/or because Valores, the 51% majority shareholder of Exelaris, also owns a subsidiary which owns la Joya which owns the hotel.

It should first be noted that plaintiff's premise—that Exelaris is controlled by HIC—is not borne out by the record. Although plaintiff asserts that HIC had the right to veto contracts into which Exelaris was proposing to enter, the Exelaris shareholders' agreement between Valores and HIC(M) does not specifically so provide. It is true that at his deposition a senior vice-president of HIC from Chicago stated this "veto right" to exist and stated that the consent of HIC(M) was required before an Exelaris contract could be effected (Novy Dep. at 30, 31), but he also testified on the other hand that HIC's permission was not needed for Exelaris to enter into the agreement with la Joya under which Exelaris manages the hotel and, furthermore, that Exelaris could have bound Hyatt (H.K.) to provide its "Group Services and Benefits" without HIC's consent (*id.* at 28–29). But this factual issue need not be resolved at this time, nor, assuming HIC did have such rights, need we determine whether the facts support a finding that it controlled Exelaris. These factual issues need not be determined because, accepting plaintiff's assertion that HIC controlled Exelaris as true for purposes of this motion, jurisdiction over ACH would nevertheless be lacking.

Exelaris is a 100% Mexican corporation, 51% of which is owned by Valores, another 100% Mexican corporation, and 49% by HIC(M). Exelaris *manages* the defendant hotel ACH pursuant to a commercial agreement with ACH's owner la Joya, another 100% Mexican corporation. La Joya is completely independent from HIC and from Exelaris. The hotel's employees are employed by la Joya. The fact that Valores is the ultimate parent of another Mexican corporation that owns la Joya does not change the situation. Thus, even assuming that HIC truly controlled Exelaris or that "Exelaris is, in fact, Hyatt," plaintiff might then be able to obtain jurisdiction over Exelaris by virtue of HIC's doing business in New York, but it is ACH, owned by la Joya and operated by Exelaris for a fee, over whom plaintiff seeks jurisdiction. It would be

---

11. The Hyatt Regency Acapulco is another hotel in Mexico not involved in this lawsuit which is apparently owned by a company named Nueva Icacos, a separate subsidiary of Valores (see Novy Dep. at 42–43, 48).

untenable to find that ACH, or its owner la Joya, is somehow "merely a department" of HIC.

I have found no case that has upheld jurisdiction in circumstances even approaching this type of remote relationship between entities. Indeed, even in those cases in which a New York *parent* has exerted substantial aspects of control over a wholly-owned foreign subsidiary, courts have refused to find jurisdiction. *See, e.g., Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65 (S.D.N.Y.1979), where the New York parent played a key role in the initial financing of the subsidiary over whom jurisdiction was sought, approved major expenditures of the subsidiary, set its price guidelines, determined its dividend, used a common trademark, had several officers on its board, trained its general manager, shared research and development functions and issued a consolidated financial statement. The proposed defendant subsidiary, moreover, admitted that as a wholly-owned subsidiary it was subject to the control of the parent shareholder, but argued that this control alone was insufficient to sustain jurisdiction. Judge Sand agreed, holding that the relationship "falls short of that corporate intimacy which has led New York courts to hold that a subsidiary is a 'mere department' of the parent." 83 F.R.D. at 69. *See also Oostdyk v. British Airtours Ltd.*, 424 F.Supp. 807 (S.D.N.Y.1976). In *Bellomo v. Pennsylvania Life Co.*, 488 F.Supp. 744 (S.D.N.Y.1980), jurisdiction was sought over a foreign parent who had several wholly-owned New York subsidiaries. The plaintiff showed that the parent was merely a holding company which did business solely through its subsidiaries, that its annual report described the business as part of a common enterprise and that the annual report consolidated the earnings statements. Judge Broderick, however, refused to find jurisdiction:

> The parent and subsidiary may not, on the basis of these facts, be treated as the same entity for jurisdictional purposes. Control through 100% stock ownership does not in itself constitute a subsidiary the alter ego of the parent. Only day to day control by the parent "so complete

that the subsidiary is, in fact, merely a department of the parent," will constitute the requisite control. Nor does the parent subject itself to jurisdiction merely by holding the affiliate group out to the public as a unitary enterprise.

488 F.Supp. at 745 (citations omitted). The only case cited by plaintiff on this issue is *Jayne v. Royal Jordanian Airlines Corp.*, 502 F.Supp. 848 (S.D.N.Y.1980), also decided by Judge Broderick, which plaintiff points to for the proposition that the "projection of a unified public persona, despite formal separateness, by which a quality service on the part of the subsidiary is suggested by identification with the parent" constitutes a "single enterprise for jurisdictional purposes," 502 F.Supp. at 860 (see Plaintiff's Memorandum of Law, dated August 11, 1987, at 18). But, plaintiff has so misleadingly taken Judge Broderick's language out of context as to wholly distort its meaning. In fact, Judge Broderick took pains in his decision to point out:

> I emphasize that it is not this factor [the "unified public persona"] by itself that establishes Arab Wings as ALIA's "mere department." Rather, it is the public association of the two companies, *together with their other points of interrelatedness*, that overcomes their corporate and operational separateness and tips the balance in favor of their constituting a single enterprise for jurisdictional purposes.

Apart from the evidence which Judge Broderick found in that case to show a "close relationship" between the parent corporation present in New York (ALIA) and its substantially-owned (88%) foreign subsidiary (Arab Wings) for promotional and solicitation purposes—evidence of a relationship far more intimate than present herein—the "other points of interrelatedness" upon which the court relied included the following:

> ALIA owns a substantial portion of Arab Wings' shares. The two companies share four directors, including the chairman of their respective boards. Exchanges of high management personnel have occurred and appear to continue

under ALIA's program of "secondment." The salary scales of the two companies appear purposely to have been correlated. ALIA has guaranteed loans made to Arab Wings. The two have jointly purchased aircraft liability insurance. Certain of Arab Wings' operational facilities are operated in "integral but distinct" fashion with those of ALIA.

502 F.Supp. at 859. Plaintiff here has submitted no evidence that HIC and ACH or la Joya share directors, exchange key management personnel, correlate salaries or make joint purchases. Indeed, the evidence is to the contrary. There is no evidence that HIC has guaranteed loans to ACH or shared any insurance policies, nor are ACH's operational facilities carried out in an integral fashion with HIC's. HIC does not recruit and train ACH's staff, does not carry ACH's assets and liabilities on its books and does not have authority to bind ACH to reservations.

In short, there are no "nearly identical ownership interests," that "must exist" between ACH and HIC before jurisdiction could be found over ACH, *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d at 120, and plaintiff has failed to show the existence of any relationship that could even arguably warrant imputing HIC's presence in New York to ACH.

### 3. ACH's "transaction of business" in New York

Plaintiff's final contention is that jurisdiction exists over ACH under CPLR § 302(a)(1). This argument need not detain us long. CPLR § 302(a)(1) provides long arm jurisdiction over a defendant as to a cause of action *arising from* that defendant's transaction of business in New York. While the definition of "transacting" business is satisfied by a lesser level of activity in the state than that of "doing" business,

there is no question here that ACH performed no act whatsoever in New York related to plaintiff's alleged contract. The contract was negotiated in person in Mexico, and ACH sent two telexes to plaintiff in New York and participated in telephonic discussions. There is not even any allegation that plaintiff dealt with the Hyatt Worldwide Sales Office or any Hyatt representative in New York. These "contacts" of ACH with plaintiff in New York by telex and telephone are plainly insufficient to confer jurisdiction. As the Second Circuit has pointed out, "New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York." *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir.1983). *See also Arrow Trading Co. v. Sanyei Corp. (Hong Kong)*, 576 F.Supp. 67, 70–71 (S.D.N.Y.1983); *Dogan v. Harbert Construction Corp.*, 507 F.Supp. 254, 260–61 (S.D.N.Y.1980); *Empresa Nacional Siderurgica, S.A. v. Glazer Steel Co.*, 503 F.Supp. 1064 (S.D.N.Y.1980). Indeed, the courts in New York have continually refused to assert jurisdiction over defendants whose contacts with New York and actual activities in New York relating to a contract at issue were far greater than ACH's here. *See, e.g., Dogan v. Harbert Construction Corp.*, 507 F.Supp. at 260–62, and cases cited in *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d at 766. Defendants "should be subject to suit where they are normally found, that is, at their pre-eminent headquarters, or where they conduct substantial general business activities. Only in a rare case should they be compelled to answer a suit in a jurisdiction with which they have the barest of contact." *McKee Electric Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 383, 283 N.Y.S.2d 34, 38, 229 N.E.2d 604, 607 (1967).[12]

---

**12.** I should mention that plaintiff additionally argues that New York General Business Law § 133 (McKinney 1968) (formerly New York Penal Law § 964) somehow mandates the assertion of § 302(a)(1) jurisdiction. But that statute has nothing to do with this case or jurisdiction herein. That statute makes it a misdemeanor for an entity to use a trade name (such as "Hyatt") with the intent to deceive or mislead the public and authorizes injunctive relief to an aggrieved owner of the trade name for such unfair competition. Plaintiff seems to be arguing that ACH cannot make use of the "Hyatt" name and then not be subject to jurisdiction in

## CONCLUSION

For the reasons set forth above, I find no basis for the assertion of personal jurisdiction over defendant Acapulco Continental Hotel, despite plaintiff's having had the opportunity to conduct thorough discovery on the issue. Therefore, I recommend that your Honor grant said defendant's motion and enter an order dismissing the complaint against it.

The parties are hereby directed that if you have any objections to this Report and Recommendation you must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court and send copies to the Honorable John F. Keenan, to the opposing party and to the undersigned. Failure to file objections within the specified time may waive your right to appeal from any order that will be entered by Judge Keenan. See *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983). Dated: New York, New York, May 24, 1988.

a state where HIC does business. This argument is so obviously frivolous that I do not believe any discussion is warranted.